FILED
APR 03 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KESEY, LLC, an Oregon Limited Liability Company,

Plaintiff,

v.

MICHELLE FRANCIS, aka MISCHELLE McMINDES, an individual; MIKE HAGEN, an individual; KATHERINE WILSON, an individual; SUNDOWN & FLETCHER, INC., an Oregon corporation; ASSOCIATES FILM PRODUCER SERVICES, an Oregon partnership or other business entity; and DOES 1 through 100, inclusive,

Defendants.

CV. 06-540-AC

OPINION AND ORDER

---

ACOSTA, Magistrate Judge:

*Opinion and Order on Evidentiary Objections*

In December of 1983, Michelle Francis ("Francis")[1] and Mike Hagen ("Hagen") approached

[1]Michelle Francis was also known as Mischelle McMindes and signed documents relevant to this action using that name. She will be referred to as Michelle Francis throughout this Opinion.

Ken Kesey ("Kesey") and asked him to write a screenplay about the Pendleton Round-Up (the "Screenplay"). Kesey agreed and worked on the Screenplay for most of 1984, initially with the assistance of Irby Smith ("Smith") and then alone. In September of 1984, Kesey delivered the final draft of the Screenplay detailing the events of the 1911 Pendleton Round-Up entitled the "Last Go Round," to Sundown & Fletcher ("S&F"), a corporation created by Francis and Hagen[2] to market and license the Screenplay.

In the early 1990's, both S&F and Kesey optioned their rights in the Screenplay to Katherine Wilson ("Wilson") through her company Associates[3] Film Producers Services ("Associates")(collectively the "Wilson Defendants"). Later in the 1990's, Kesey wrote a novel with Ken Babbs ("Babbs") using virtually the same characters and plots as the Screenplay, also entitled the "Last Go Round" (the "Novel"). The Novel was published in 1994.

Kesey died intestate on November 10, 2001. Kesey's heirs formed plaintiff Kesey, LLC ("Plaintiff"), a limited liability corporation, for the sole purpose of holding and handling Kesey's intellectual property. On April 14, 2003, Norma Faye Kesey ("Faye"),[4] Kesey's widow and the personal representative of his estate, assigned all of Kesey's interest in the Screenplay to Plaintiff. Smith quitclaimed his interest in the Screenplay to Plaintiff on April 11, 2006.

On April 21, 2006, Plaintiff filed this action against Francis, Hagen and S&F ("Defendants")

---

[2]Kendall Early was also a co-founder of S&F but is not involved in this litigation.

[3]The pleadings and documents filed in this case refer to this defendant as both "Associates Film Producers Services" and "Associated Film Producers Services." To be consistent, the court will refer the corporation as Associates, which is how the defendant is identified in the court caption.

[4]While the legal name of Kesey's widow is Norma Faye Kesey, she is referred to as Faye throughout the pleadings because she identifies herself using her middle name.

asking the court to determine who owns the rights to the Screenplay.[5] Presently before the court are summary judgment motions filed by both Plaintiff and Defendants. Both parties included in the summary judgment pleadings numerous objections to each other's evidentiary offerings. These include general objections to a body of evidence, such as Plaintiff's objection to the authentication of Defendants' evidence and Defendants' objection to Plaintiff's submissions of settlement negotiations, as well as specific objections to testimony, factual statements or exhibits, such hearsay, relevance and lack of foundation.

In this Opinion,[6] the court addresses the parties myriad evidentiary objections, ruling on the general objections first and then moving to the specific objections to the evidence that survive the general objections. Determination of the merits of the parties' respective arguments necessarily turns on the evidence each has offered in support of their positions. Those evidentiary offerings have drawn numerous objections and those objections must be resolved before the merits of the parties' motions can be addressed and decided. Therefore, the court will address the merits of the parties' respective summary judgment motions in a separate Findings and Recommendation.[7]

/////

/////

---

[5]Plaintiff also named the Wilson Defendants as defendants in this action. Plaintiff and the Wilson Defendants resolved their dispute and filed a stipulated motion for judgment on September 10, 2007. The Wilson Defendants remain in the case as cross claimants.

[6]Evidentiary rulings are nondispositive and are subject to the "clearly erroneous" or "contrary to law" standard of review by a district judge if such rulings are objected to by a party. 28 U.S.C. § 636(b)(1)(A) (2007); FED. R. CIV. P. 72(a).

[7]Judge Stewart of this court took the same approach in *Tefera v. City Center Parking*, CV No. 07-1413-ST, 2009 WL 439706 (D. Or. Feb. 20, 2009).

*General Evidentiary Objections*

A. Authentication of Defendants' Evidence

Plaintiff objects to the deposition testimony and documentary evidence offered by Defendants, arguing that the evidence is not properly authenticated. In support of their motion for summary judgment, Defendants offer three affidavits from Francis and 137 pages of deposition testimony and documentary evidence. The 137 pages consist of copies of the specific page or item referenced in Defendants' Concise Statement of Material Facts ("Defendants' Facts") and is prefaced by Defendants' Index of Evidence in Support of Concise Statement of Facts (the "Index") which correlates each page to the factual statement. If the page is from a deposition, the Index specifies the party being deposed as well as the jump cite for the relevant information. If the page is from an affidavit, the Index identifies the affiant and the paragraph relied on. If the page is a document, such as a letter, the Index refers to the document as an exhibit to a deposition, the deponent and the jump cite where the document was discussed. To illustrate, in support of factual statement number 11, the Index reveals that the evidentiary support is found at pages 39-43 and consists of Francis' deposition testimony at 65:7-19 and Exhibit 2 to the Hagen deposition at 40:18-22 and 41:13-42:17. Only the pages identified in the Index have been offered. The deposition testimony and documentary evidence are not otherwise authenticated.

1. Standards

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(e). "The requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in

question is what its proponent claims." FED. R. EVID. 901(a). Evidence that is not properly authenticated will not be considered by the court when reviewing a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

The judges in this district have cited *Orr* on numerous occasions and have, for the most part, applied and enforced the authentication requirements set forth therein. *See Tefera v. City Center Parking*, CV No. 07-1413-ST, 2009 U.S. Dist. LEXIS 13431, at *1 (D. Or. Feb. 29, 2009)(deposition excerpts not properly authenticated by plaintiff under *Orr* were still considered by the court when they were easily identifiable as part of the same depositions properly offered and authenticated by defendant even though they were not the same pages offered by the defendant); *Briggs v. Holsapple*, CV No. 08-6037-KI, 2009 WL 395134, at *1 n.1 (D. Or. Feb. 11, 2009)(court noted that neither party had properly authenticated deposition excerpts with a cover page and reporter's certificate as required by *Orr* and suggested that parties submit all relevant pages from a deposition together, but then considered the evidence despite the fact that it was "needlessly frustrating to determine the identity of the deponent."); *Tyle v. Bergelectric Corp.*, CV No. 07-284-AC, 2008 WL 2677995, at *2-3 (D. Or. July 2, 2008)("Rule 56 Documents" offered by pro se plaintiff after receiving summary judgment advice notice but before defendant filed summary judgment motion were not properly authenticated and were not admissible); *Till v. American Family Mutual Insurance Co.*, CV No. 06-1376-BR, 2007 WL 1876511, at *6 (D. Or. June 26, 2007)(court relied on *Orr* in considering whether hearsay evidence was sufficiently reliable to be admitted to defeat a summary judgment motion); *United States ex rel. Sutton v. Reynolds*, 564 F. Supp. 2d 1183 (D. Or. 2007)(documents and transcripts that were not authenticated in accordance with *Orr* were inadmissible and not considered by the court with the exception of evidence that was offered by both

parties and properly authenticated by one); *Simpson v. Held*, CV No. 07-44-BR, 2007 WL 1667148, at *2 (D. Or. June 1 2007)(relying on *Orr* for the proposition that "[t]he Court may only consider admissible evidence that is submitted by a party in support of a pleading"); *Krouth v. Brown*, CV No. 04-1045-BR, 2006 WL 3758256, at *3 (D. Or. Dec. 18, 2006)(citing *Orr* as authority for "well-settled rule" that "only admissible evidence may be considered when ruling on a motion for summary judgment"); *Schleining v. Chicago Pneumatic Tool Co.*, 04-1413-BR, 2006 WL 696309, at *3 (D. Or. March 15, 2006)(restating the requirement of both a caption and a reporter's certificate to authenticate a trial transcript); *Gorans v. Washington County*, CV No. 04-423-BR, 2005 WL 1586762, at *3-4 (D. Or. July 1, 2005)(failure to indicate in the court reporter's certificate whether the deponent reserved the right to read and correct the deposition transcript was not fatal to proper authentication when all other requirements of *Orr* were met); *Fischer v. City of Portland*, CV No. 02-1728-BR, 2004 WL 2203276, at *1 (D. Or. Sept. 27, 2004)(summarizing the requirements stated in *Orr* and then applying them to numerous evidentiary objections); *Rowder v. Banctec, Inc.*, CV No. 03-1463-KI, 2004 WL 1490325, at *3 (D. Or. July 1, 2004)(court excluded letter that was not properly authenticated with an affidavit in accordance with Orr.); *Standish v. Woods*, CV No. 03-933-AS, 2004 WL 1379466, at *4 (D. Or. May 10, 2004) (Unauthenticated documents were not considered on motion for summary judgment but court did grant motion to dismiss the claim on another basis); *Elston v. Toma*, CV No. 01-1124-BR, 2004 WL 1048132, at *3 (D. Or. April 15, 2004)(court applied the rule enunciated in *Orr* that documents produced by a party in discovery are deemed authentic when offered by the party-opponent and found the documents admissible); *Bonneau v. Clifton*, 215 F.R.D. 596, 601 (D. Or. 2003)(court did not exclude evidence when party corrected oversight by providing a copy of the court reporter's certificate required for deposition

excerpts by *Orr* after objections were filed); *Sams v. Geico Corp.*, CV No. 01-1458-BR, 2002 WL 31975065, at *2 (D. Or. Nov. 27, 2002)(*Orr* cited and relied on for the proposition that only admissible evidence is to be considered when ruling on a summary judgment motion and for the manner in which to authenticate documents through personal knowledge); *Grimm v. Healthmont, Inc.*, CV No. 01-982-BR, 2002 WL 31549095, at *3 n.2 (D. Or. Oct. 29, 2002)(copy of severance pay plan not offered through individual who had the personal knowledge to authenticate it properly was inadmissible and not considered by court); *Blount v. Connecticut General Life Insurance, Co.*, CV No. 01-1341-BR, 2002 WL 31974405, at *1 (D. Or. July 2, 2002)(court relied on general admissibility standard for summary judgment evidence and specific requirements for authenticating documents through personal knowledge) Various judges also have recognized that, in addition to the specific authentication methods specifically set forth in *Orr*, the Ninth Circuit acknowledged that evidence may also be authenticated by reviewing its content pursuant to Fed. R. Evid. 901, which requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." *See Precision Castparts Corp. v. Hartford Accident Indemnity Co.*, CV No. 04-04-1699-HU, 2007 WL 2590438, at *7-8 (D. Or. Aug. 27, 2007)(documentary evidence that was identified by counsel's affidavit as documents produced by opposing party, were on opposing parties' letterhead or were identified by opposing parties' witnesses in deposition testimony was properly authenticated under Rules 901 and 902); *Renteria v. Oyarzun*, CV No. 05-392-BR, 1007 WL 1229418, at *2 (D. Or. April 23, 2007)(in the absence of any evidence to show that the excerpts were fraudulent, deposition transcripts which lacked a copy of the court reporter's certification but did include the cover page identifying the deponent, the action and the time and place of the deposition were authenticated under Rule 901(b)(4)); *Prineville Sawmill Co. v. Longview Fibre Co.*, CV No.

01-1073-BR, 2002 WL 31974434, at *11 (D. Or. Sept. 23, 2002)(in the absence of evidence showing that the excerpts were fraudulent, deposition excerpts which included the cover page of the deposition identifying the deponent, the action and the time and place of the deposition and which were attached to an affidavit in which counsel attests that the excerpts were true copies of the transcripts provided by the court reporter who took the deposition were sufficiently authenticated under Rule 901(b)(4)). Also, a few judges have acknowledged the authentication requirements set forth in *Orr* but have declined to strike unauthenticated evidence in light of the court's ultimate ruling against the proponent of such evidence. In other words, the court found that the unauthenticated evidence was not outcome determinative. *See Mountain Forestry, Inc. v. Oregon Dept. of Forestry*, CV No. 06-1082-AC, 2008 WL 2388667, at *3 n.6 (D. Or. June 10, 2008)(deposition excerpts which did not comply with *Orr* requirements were not properly authenticated and not admissible even though court considered evidence in light of lack of objection and fact that evidence contained in excerpts was not outcome determinative); *Paulson v. Carter*, CV No. 04-1501-KI, 2006 WL 381951, at *1 (D. Or. Feb. 16, 2006)(court considered evidence to provide plaintiff with the benefit of the doubt even though plaintiff's evidence was not properly authenticated under the requirements set forth in *Orr*); *Estate of Elkan v. Hasbro, Inc.*, CV No. 04-1344-KI, 2005 WL 3095522, at *2 (D. Or. Nov. 18, 2005)(court acknowledged that *Orr* requirements for documents authenticated by personal knowledge – "the document must be attached to an affidavit from an affiant through whom the exhibit could be admitted into evidence"– were not met but relied on the evidence anyway to give the plaintiff the benefit of every inference); *Paul v. County of Union, et al.*, CV No. 04-1543-HU, 2005 WL 2083017, at *11-12 (D. Or. Aug. 22, 2005)(defendants' motion to strike deposition transcripts denied as moot based on recommendation

that defendants' summary judgment motion be granted even with consideration of plaintiff's evidence and plaintiff's submission of appropriate authentication documents with his response brief).

On one occasion, this court distinguished between admissibility requirements for evidence offered at the summary judgment stage and evidence presented at trial, and considered evidence in ruling on a summary judgment motion even though the evidence was not authenticated as required by *Orr*. In *Thompson v. Lampert*, CV No. 02-135-HU, 2004 WL 1673102, at *5 (D. Or. July 24, 2004), the court noted that the admissibility of the contents of the evidence, rather than the admissibility of the form of the evidence, is the primary question at the summary judgment stage. If the evidence "can be presented in admissible form in trial, the court may consider it at the summary judgment stage." *Id.* While acknowledging that the plaintiff's allegations were inadmissible in their current form because they were not contained in a sworn declaration or affidavit, the court held that "because plaintiff could testify under oath at trial regarding his personal knowledge of what he could or could not do in his cell without a wheelchair and how the lack of a wheelchair in the cell affected him, I have considered his unsworn statements at this point." *Id.*

The judges in this district have applied the tenets of *Orr* in differing ways. However, the general principles enunciated by the Ninth Circuit in that case – that evidence must be sufficiently reliable before the court may consider it and that the authentication requirement is not merely a pro forma concept – have been consistently adopted and followed. The court will consider Plaintiff's objections to the evidence offered by Defendants in support of their summary judgment motion in accordance with the *Orr* guidelines.

2. Deposition Excerpts

Plaintiff asserts that none of the deposition testimony is properly identified and that

certification from the court reporter is lacking. The Ninth Circuit stated in *Orr* that:

> A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent. See Fed. R. Evid. 901(b); Fed. R. Civ. P. 56(e) & 30(f)(1). Ordinarily, this would be accomplished by attaching the cover page of the deposition and the reporter's certification to every deposition extract submitted. It is insufficient for a party to submit, without more, an affidavit from her counsel identifying the names of the deponent, the reporter, and the action and stating that the deposition is a "true and correct copy." Such an affidavit lacks foundation even if the affiant-counsel were present at the deposition.

*Orr*, 285 F.3d at 774 (footnote and case citations omitted). The deposition excerpts offered by Defendants are not accompanied by either a cover page or a reporter's certification, nor are they identified in an affidavit from counsel and, with the exception of names on the top of some of the pages, have no identifying information. It is impossible to tell from the excerpts who is being deposed, who is asking the questions, when the deposition occurred and whether the deposition relates to this action. Defendants took no steps to authenticate the deposition excerpts even after Plaintiff filed their objections. Defendants' deposition excerpts are not properly authenticated under any reasonable interpretation of the rule.

Plaintiff, however, has offered and authenticated a number of excerpts from the depositions of the same individuals, thereby providing the basis for their admissibility. In *Orr*, the Ninth Circuit held that:

> when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity.

*Orr*, 285 F.3d at 776. The deposition excerpts offered by Defendants from the depositions of Hagen, Faye, and Shannon Kesey are identified at the top with the name of the deponent, and at the bottom

with the name and phone number of the court reporting service that recorded and transcribed the deposition, and are consistent, both in content and appearance, with the properly authenticated excerpts offered by Plaintiff. Accordingly, Defendants' excerpts from these depositions are properly authenticated through Plaintiff's submissions. However, the deposition excerpts from Francis and Wilson do not contain identifying features that are consistent with the depositions offered and authenticated by Plaintiff. Therefore, any excerpt submitted by Defendants from the depositions of Francis and Wilson not also offered by Plaintiff are not properly authenticated and not admissible. Plaintiff's objections to pages 1, 2, 9-11, 16, 17, 25, 36, 39, 60, 62, 63, 65, 67-77, 89-94, 104, and 124 of Defendants' evidence in support of their concise statement of facts, which represent deposition excerpts of Francis and Wilson not offered or authenticated by Plaintiff, therefore are sustained and the evidence stricken from the record.

3. Documentary Evidence

Plaintiff also contends that the documentary evidence offered by Defendants is not properly authenticated. As with the deposition excerpts, some of the documents offered by Defendants also have been offered and authenticated by Plaintiff. These documents, which include a January 1984 letter signed by Kesey (page 27), copies of cancelled checks to either Kesey or Irby Smith signed by Hagen or Francis (pages 42, 43, 47 and 48), the first and last pages from the Screenplay (pages 58 and 59), a Deal Memo Option Agreement signed by Hagen, Francis and Wilson on August 14, 1990 (pages 78-81), a Deal Memo Option Agreement signed by Hagen, Francis and Wilson on August 12, 1992 (pages 85-88), a February 8, 1994, letter from Lawrence Rose to William Skrzyniarz (pages 105 and 106), a February 18, 1994, letter from William Skrzyniarz to Lawrence Rose (pages 108 and 109), and a May 19, 1994, letter from Lawrence Rose to William Skrzyniarz (page 123), are properly

before the court and will be considered. Plaintiff's objections to this documentary evidence are overruled.

Additional correspondence between Lawrence Rose and William Skrzyniarz (pages 95, 96, 107, and 110-122), as well as a letter dated February 15, 2002, from Michael Rudell to Sterling Lord (pages 128 and 129), and an email dated September 23, 2004, from Stephen Fromkin to Shannon Kesey (page 132), is identified with Bates numbers starting with a "P" indicating that the letters were produced during discovery by Plaintiff. "Documents produced by a party in discovery are deemed authentic when offered by the party-opponent." *Elston*, 2004 WL 1048132, at *3 (citing *Orr*, 285 F.3d at 777 n.20). Accordingly, Plaintiff's objections to pages 95, 96, 107, 110-122, 128, 129, and 132 are also overruled.

Page 24 of Defendant's evidence in support of their motion for summary judgment is a newspaper article date September 13, 1984, from the *Tri-City Herald* entitled *Kesey Back in Saddle for Film on Round-Up*. Rule 902 of the Federal Rules of Evidence provides that "[p]rinted materials purporting to be newspapers or periodicals" are self-authenticating. FED. R. EVID. 902(6). Plaintiff's assertion that page 24 is not properly authenticated is without merit and is overruled.

Defendants offer a document that appears to be a signed draft of the August 14, 1990, Deal Memo Option Agreement between S&F and Associates (pages 82-84). The authentication of documentary evidence can be accomplished through a witness who "wrote it, signed it, used it or saw others do so." *Orr*, 285 F.3d at 774 n.8 (quoting 31 WRIGHT & GOLD, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 7106, at 43 (2000)). The excerpt from Wilson's deposition that originally identified this document was not properly authenticated and has been stricken from the record. Defendants have not attempted to authenticate this document in any other manner. Plaintiff's

objection to this document is sustained and the document stricken from the record.[8]

The last documents offered by Defendants are pages of Francis's affidavit signed June 16, 2008. The entire affidavit has been offered by Defendants and is part of the record. Plaintiff's objection to the pages of the affidavit, found at pages 6, 7, 12, 13, and 133-136, is overruled.

4. Unsubmitted Evidence

Plaintiff also notes that Defendants refer to evidence not filed with the court in their summary judgment pleadings. For example, in their brief in support of summary judgment, Defendants refer to their request for production of documents and, in their objections to Plaintiff's evidence, they mention deposition testimony given by Katherine Wilson but not offered by either party. The court will not consider this evidence as it was not properly offered and authenticated as required by *Orr*. Thus, Plaintiff's objection on this point is sustained.

B. General Objections to Defendant's Concise Statement of Material Facts

In addition to the objections to the authentication of Defendants' evidence, Plaintiff generally asserts that "Defendants' 'evidence' consists mostly of assertions, speculation and innuendo" and does not support their concise statement of facts or the arguments made in their memorandum in support of summary judgment. (Pl.'s Evidentiary Objections at 1.) Plaintiff further argues that the court "is under no obligation to complete the jigsaw puzzle of evidence offered up by the S&F Defendants." (Pl.'s Evidentiary Objections at 2.) The court must determine what evidence is admissible, relevant, and substantive. FED. R. EVID. 104. In fact, the court has already addressed the admissibility issues based on lack of authentication and will address Plaintiff's specific

[8]The final draft of this document, which incorporates all of the changes noted on the document, was offered by both Plaintiff and Defendants and has been admitted.

objections to Defendants' concise statement of facts and the evidence offered in support of those facts in detail below. To the extent Defendants' arguments are not based on proper evidence in the record, the court will discount or reject such arguments and rule accordingly when addressing the merits of the parties motions for summary judgment.

C. Declarations Filed in Support of Plaintiff's Motion for Summary Judgment

Defendants object to the declarations submitted by Plaintiff in support of its motion for summary judgment, including those of Faye, Babbs, Smith, and David Aronoff, based on the fact that none of the declarations were witnessed by a notary. A party filing a motion for summary judgment will generally support that motion with affidavits. Under Rule 56 of the Federal Rules of Civil Procedure, the affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e)(1). While Rule 56 refers specifically to affidavits, a party may also offer unsworn declarations in support of a motion for summary judgment provided the declarations comply with the requirements of 28 U.S.C. § 1746. Section 1746 requires that an unsworn declaration executed within the United States include language that "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct," as well as the date on which the declaration was executed. 28 U.S.C. § 1746 (2007).

In each of the declarations Plaintiff offered, language substantially similar to the following appears immediately above the declarant's signature:

> I declare under penalty of perjury under the laws of the United States and the State of Oregon that the forgoing is true and correct and that this Declaration was executed

by me in Creswell, Oregon, on June 10, 2008.[9]

Plaintiff's declarations clearly comply with the requirements of Rule 56 and § 1746. Defendants' objections to Plaintiff's declarations are overruled.

D. Settlement Negotiations

Plaintiff offers statements attributable to Francis and Hagen, as well as documents drafted by Defendants, after September 1984, the date Kesey delivered and was paid for the second draft of the Screenplay. Defendants assert that these statements and documents were related to settlement negotiations and are barred by Rule 408 of the Federal Rules of Evidence.

1. Standards

Rule 408 provides:

> **(a) Prohibited uses.** – Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
> > (1) furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a pubic office or agency in the exercise of regulatory, investigative, or enforcement authority.
>
> **(b) Permitted uses.** – This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

FED. R. EVID. 408. The purpose behind Rule 408 is to foster the "promotion of the public policy

---

[9]The language differs only with regard to the city and date on which the declaration was executed.

favoring the compromise and settlement of disputes." FED. R. EVID. 408 advisory committee's note. Accordingly, Rule 408 does not apply when the parties were not engaged in the compromise or settlement of a dispute at the time the statements were made or the documents created.

Federal courts are divided on what conduct qualifies as the compromise or settlement of a dispute. The Second Circuit has held that "where a party is represented by counsel, threatens litigation and has initiated the first administrative steps in that litigation, any offer made between attorneys will be presumed to be an offer within the scope of Rule 408." *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820, 827 (2d Cir. 1992). In the Third Circuit, "Rule 408 applies where an actual dispute or a difference of opinion exists, rather than when discussions crystallize to the point of threatened litigation." *Affiliated Mfrs., Inc. v. Aluminum Co. of America*, 56 F.3d 521, 527 (3d Cir. 1995). Similarly, the Eleventh Circuit found that "[f]or Rule 408 to apply, there must be an actual dispute, or at least an apparent difference of opinion between the parties, as to the validity of a claim." *Dallis v. Aetna Life Ins. Co.*, 768 F.2d 1303, 1307 (11th Cir. 1985).

A few courts have addressed the issue of whether parties were engaged in business communications rather than settlement negotiations in the context of Rule 408. In *Big O Tire Dealers, Inc. v. Goodyear Tire and & Rubber Co.*, 561 F.2d 1365 (10th Cir. 1977), the parties were in a dispute over the use of the term "Bigfoot" to describe and advertise their tires. Big O began its use of "Bigfoot" with regard to its tires in February 1974. *Id.* at 1368. In late August 1974, before launching its "Bigfoot" campaign, Goodyear asked Big O for a letter indicating that it had no objection to Goodyear's use of the term. On September 10, 1974, the parties met to discuss the issue further. During this meeting, Big O voiced objections to Goodyear's use of "Bigfoot," represented that it would not be interested in selling the right to use the term, and asked Goodyear to wind down

the "Bigfoot" campaign as soon as possible. Goodyear launched its "Bigfoot" promotion on September 16, 1974. The next day, Big O sent a letter to Goodyear confirming its belief that Goodyear would quickly wind down the "Bigfoot" campaign. Goodyear denied that it agreed to discontinue the "Bigfoot" campaign and represented that it would continue to use "Bigfoot" indefinitely. On October 10, 1974, Goodyear mentioned that it might be willing to pay Big O for the use of the term "Bigfoot". Big O again indicated that it was not interested in selling Goodyear the right to use the term. Goodyear explained that it wanted to avoid litigation and then commented that if Big O initiated litigation, the case would last long enough to allow Goodyear to benefit from the Bigfoot campaign for as long as it desired. *Id.*

Big O offered the communications between the parties as evidence. Goodyear objected arguing that the communications were inadmissible as compromise negotiations under Rule 408. The district court ruled that the communications were "simply business communications and were relevant and material to show knowledge, willful infringement, and misconduct by Goodyear." *Id.* at 1372. The Tenth Circuit sustained the ruling, agreeing that the communications were "simply business communications." *Id.* at 1373.

> A careful perusal of all the testimony relating to the communications convinces us that the court did not commit manifest error in ruling they were business communications and not compromise negotiations. The discussions had not crystallized to the point of threatened litigation, a clear cut-off point, until after October 10, the date of the conversations between Big O's president and Goodyear's executive vice-president.

*Id.*

The District Court of Puerto Rico found that seven letters exchanged between counsel prior to litigation were compromise negotiations rather than business communications, and were

inadmissible under Rule 408. *Matosantos Commercial Corp. v. SCA Tissue North American, LLC.*, 369 F.Supp.2d 191 (D.P.R. 2005). The court explained that:

> [i]t is evident from the letters that the negotiations between the parties were meant to appease MCC's discontent with the loss of its exclusivity on the Savoy and Coronet product lines. MCC did mention on its counsel's letters that it believed to have a valid Law 75 claim against SCA and proposed the terms of the agreement that would cause it to desist from filing suit. Specifically, MCC stated that SCA was in violation of its exclusive distribution rights and that, if an agreement was reached, it was "willing to waive whatever causes of action it might have against SCA" (cite omitted). In its response letters, SCA stated its terms for a continuing relationship between the two corporations and set forth its understanding that its acts did not give rise to a Law 75 action. Clearly, these were not merely business communications but rather compromise negotiations meant to avoid litigation and, contrary to SCA's assertion, the threat of litigation was latent.

*Id.* at 199.

The Ninth Circuit has likewise found that the circumstances surrounding the communications, including both the timing of the offer and the existence of a disputed claim, are relevant to the determination of whether they were made in the compromise or settlement of a dispute. In *Cassino v. Reichhold Chemicals, Inc.*, 817 F.2d 1338 (9th Cir. 1987), the court distinguished between a severance plan offered at the time an employee is terminated in exchange for a release of all potential claims and compensation offered to a previously terminated employee which is contingent upon the release of the employee's discrimination claim. The court explained that in the latter circumstance, the employee relinquishes the right to a judicial determination of a viable discrimination claim and, as such, the offer of compensation qualifies as a settlement offer under Rule 408. On the other hand, the circumstances surrounding the offer of a severance package which occurs contemporaneously with the notice of termination is generally considered to be relevant to the issue of whether discrimination occurred. *Id.* at 1342. The court explained:

> [Where] the employer tries to condition severance pay upon the release of potential claims, the policy behind Rule 408 does not come into play. Rule 408 should not be used to bar relevant evidence concerning the circumstances of the termination itself simply because one party calls its communication with the other party a "settlement offer."

*Id.* at 1343. *See also Coleman v. Quaker Oats*, 232 F.3d 1271, 1290 (9th Cir. 2000)(district court did not abuse its discretion in excluding employer's offer of additional medical benefits in exchange for a release of claims after terminated employee filed a discrimination charge with the EEOC); *Mundy v. Household Finance Corp.*, 885 F.2d 542, 547 (9th Cir. 1989)(employer's offer of payment of money for outplacement services three weeks after termination and after terminated employee had retained legal counsel but before any claims were filed were properly excluded under Rule 408 as a settlement offer).

The Ninth Circuit again relied on the purpose and public policy considerations behind Rule 408 in finding that statements made during a grievance proceeding prior to the filing of a discrimination claim were not made in furtherance of the settlement of a dispute and were, therefore, admissible. *Josephs v. Pacific Bell*, 443 F.3d 1050, 1064 (9th Cir. 2006). In *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 784 (9th Cir. 2006), the Ninth Circuit upheld the trial court's decision not to exclude an internal memorandum written almost a week before the parties settlement discussions "crystallize[d]." The Ninth Circuit reasoned that:

> Because the memorandum did not contain evidence "furnishing or offering or promising to furnish . . . valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount," Fed. R. Evid. 408, and because the memorandum was written before settlement discussions began, admission of the memorandum by the district court did not constitute reversible error.

*Id.*

The Ninth Circuit follows those courts that draw a clear distinction between communications in furtherance of business interests and settlement negotiations arising from actual disputes, and it imposes the requirement that settlement discussions must have first "crystallized" before Rule 408's bar will apply. Indeed, Rule 408's purpose "is to encourage the compromise and settlement of *existing disputes*." *Josephs v. Pacific Bell*, 443 F.3d at 1064 (italics added). *See also* 2 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 135, at 86 (2d ed. 1994) ("But the Rule has distinct limits. Perhaps most importantly, it assumes the existence of a controversy – a difference which can be compromised. Hence, it does not exclude statements or conduct made before such controversy arises.").

2. Discussion – September and October 1984 Communications

Here, the record demonstrates that the evidentiary offerings at issue concern communications that occurred before an actual dispute or controversy existed. Specifically, the evidence before the court shows that in late 1983, Francis and Hagen approached Kesey and asked him to write a screenplay about the Pendleton Round-Up. Kesey agreed and the parties entered into an agreement for Kesey to provide Defendants two distinct drafts of the Screenplay in exchange for $10,000 ($5,000 for each draft). Kesey gave Defendants the second draft of the Screenplay and received the second payment of $5,000 in mid-September, 1984. Thereafter, the parties engaged in negotiations for the motion picture rights to the Screenplay.

In describing the events that occurred after Kesey delivered the second draft of the Screenplay, Faye recounted various conversations she had with Francis. Faye remembered Francis stating that the $10,000 was paid to Kesey as an inducement for Kesey to work on the Screenplay, rather than another novel that he was working on in late 1983. (Faye Kesey Decl. ¶ 6.) In another

conversation, Francis told Faye that the $10,000 was merely a down payment on the six-month option that S&F tried to negotiate for. At his deposition, Hagen referred to the initial payment of $5,000 to Kesey in January 1984 as "kind of a kick-start to get the process going" and indicated that the discussions which occurred in late September and October 1984 were for the purpose of acquiring the rights to the Screenplay from Kesey. (Aranoff Decl. Ex. AA at 40, 84).

On September 30, 1984, Francis sent a letter to Faye forwarding copies of unrelated option/purchase agreements and discussing the terms of the proposed agreement between Defendants and Kesey. For example, Kesey had requested 2 1/2 percent of the producer's gross rather than the net. Francis agreed to add the request to the "agreement and then negotiate for that position for Ken when we form an alliance with our 'line producers.'" Francis then asked Faye to:

> consider the revised agreement that you will receive in a few days. We cannot move forward (i.e. solicit funds or seriously negotiate) without the fundamental agreement between S&F, Inc. and Ken. The sooner we get an agreement the more likely we can reach our goal of filming next Round Up.
>
> * * *
>
> I hope we can get these arrangements done as soon as possible. At that time we can write the check for $10,000 and begin the option period. Thank you for your help in this matter – I hope the initial agreement you receive will be able to be negotiated to comfortable terms for you and Ken.

(Aronoff Decl. Ex. E at 1-2.)

Francis forwarded the revised agreement discussed in the letter of September 30, 1984, to Faye on October 4, 1984. The cover letter read:

> Enclosed is the agreement w/ 2 1/2 of producers gross. I have a couple investors waiting for your terms and signatures. Also, Carey Williams has a production company interested in discussing this as soon as we secure agreements.

(Aronoff Decl. Ex. F at 1.) The enclosed "Deal Memo Option/Purchase Agreement" provided for

the sale of a six-month option to the motion picture rights of the Screenplay from Kesey to S&F in exchange for a payment of $20,000, $10,000 of which had already been paid to Kesey and the remainder to be paid after the signing of the agreement. The option could be extended by S&F, Inc., for $1,000 per month for an indefinite period. If the option was exercised, Kesey was entitled to $50,000, plus either $25,000 or $50,000, depending on the final approved budget of the motion picture, and 2 1/2 percent of the producer's gross profits as defined in the agreement. (Aronoff Decl. Ex. F at 2.) Kesey was designated as the "Owner" of the Screenplay and, by signing the agreement, would represent and warrant that he was "the sole owner of all rights in the Property which are optioned and has the full and sole right and authority to convey the same." (Aronoff Decl. Ex. F at 2, 5.)

It is clear from this evidence that the parties were engaged in business negotiations, not settlement negotiations, in late September and October 1984. There was no dispute over who owned the copyright in the Screenplay. Both Francis and Hagen acknowledged that Kesey owned the copyrights and that S&F needed to acquire such rights before attempting to license the Screenplay. The "Deal Memo Option/Purchase Agreement" specifically provided that Kesey was the sole owner of all rights in the Screenplay. Defendants were merely engaged in business negotiations to purchase option rights from Kesey. No offer of compromise of a disputed claim was implicated in the correspondence between the parties during this time. In the absence of an actual dispute or an offer to compromise an existing controversy, Rule 408 is not applicable and does not bar the admission of this evidence. Defendants' Rule 408 objections to the documentary evidence found at Exhibits E and F, and the testimonial evidence found in the declarations and deposition excerpts offered by

Plaintiff relating to communications which occurred in the mid-1980's, are overruled.[10]

3. Discussion – 2004 and 2005 Communications

Defendants assert the same Rule 408 objection to evidence offered by Plaintiff relating to communications between the parties in 2004 and 2005. On December 13, 2004, Defendants' attorney forwarded a letter to the literary agent who had represented Kesey[11] claiming that S&F owned "the screen rights to the screenplay written as a work for hire by Ken Kesey in 1983-1984 entitled 'Last Go Round.'" (Aronoff Decl. Ex. T at 1.) The letter advised the recipients that S&F had copyrighted the Screenplay in 1994, and that the Wilson Defendants had copyrighted a revised version of the Screenplay in 1994 as well. After describing the evidence he felt supported the claim that S&F owned the rights to the Screenplay, Defendants' counsel stated:

> If you believe that there is a legal basis to conclude that anyone other than my client holds the rights to this screenplay (and all of its versions), we would ask that you reply immediately to inform us of the basis for any claim which may be asserted by any other person or party. We would ask that you not only inform us of any person or entity which you think may have a claim, but more importantly, of any facts which would support a position that this was not a work for hire. We would assume that if we agree that this was a work for hire that there would also be agreement that my client would hold all rights. Thus, only if there is a factual dispute related to this being a work for hire would there be any further issue to discuss.
>
> We understand that you were planning on closing on a deal and we thought it best to inform you as soon as possible that we do not believe that your clients have any legal basis to pursue a deal that does not include my client. We ask that you refrain [from] any further efforts to market rights that do not belong to anyone other than my client.
>
> As the holder of all legal rights in this matter, my client is pursuing its options

---

[10] Defendants also object to some of this evidence on relevance grounds. This objection is discussed below.

[11] The letter was also addressed to David Skinner and to Klarquist, Sparkman, a Portland, Oregon, intellectual property law firm.

> with various studios as we speak and will continue to do so unless and until there is some demonstrated basis to conclude that this was not a work for hire.

(Aronoff Decl. Ex. T at 2.)

Plaintiff's counsel responded to the letter on October 14, 2005, contesting S&F's ownership of the Screenplay based on a work-for-hire argument and asserting that the Screenplay was exclusively owned and controlled by the successors-in-interest to the rights of Kesey. (Aronoff Decl. Ex. U.) Plaintiff's counsel set forth in detail his arguments to refute Defendants' position that Kesey wrote the Screenplay as a work for hire or an employee of S&F and noted that Kesey had published the Novel in 1994. He then closed:

> Finally, your letter concludes by stating that your client "is pursuing its options with various studios . . . and will continue to do so . . . ." Please be advised that any such conduct by your clients, as well as any other assertion of rights by your client in the Screenplay, is damaging my clients and is wrongfully interfering with their prospective economic advantages as the true holders of the copyright and all other rights in the Screenplay. Accordingly, demand is hereby made that your client immediately cease and desist from any conduct under which it is claiming rights in the Screenplay. If your client does not do so, my clients will have no choice but to commence appropriate legal action seeking, among other things, monetary, injunctive, and declaratory relief.
>
> We look forward to your prompt assurances that your client will immediately cease and desist from the above-described conduct. Should we not expeditiously receive such assurances, based on your statement that your client "is pursuing its options with various studios . . . and will continue to do so," my clients may have no choice but to begin appropriate legal proceedings.
>
> This letter is not intended as a comprehensive statement of my clients' rights and remedies, all of which are expressly reserved.

(Aronoff Decl. Ex. U at 4.)

Neither letter comes within Rule 408's bar. Defendants' counsel's December 13, 2004, letter presumes no dispute exists went he sent it to Plaintiff's attorney. The letter simply is an assertion

and summary explanation of Defendants' position regarding the Screenplay copyright, coupled with an invitation to Plaintiff to offer any facts that contradict that position. Plaintiff's counsel's October 14, 2005, letter, to be sure, made clear that an actual dispute existed between the parties, but it lacks any language that reasonably can be interpreted as furnishing, offering to furnish, or promising to accept consideration or any other thing of value to settle or compromise the parties' dispute. In fact, the letter conveys the opposite message: that Plaintiff will initiate legal action against Defendants if Defendants do not "cease and desist" their efforts to market the Screenplay.

In the absence of the existence of a dispute or an offer of valuable consideration to compromise a dispute prior to the October 14, 2005, letter, Rule 408 does not apply. Defendants' Rule 408 objection to these letters, identified as Exhibits T and U, as well as the related testimonial evidence, is overruled.[12]

E. Statements Attributable to Ken Kesey

Defendants argue that all of the statements offered by Plaintiff and attributable to Kesey are hearsay for which no exception exists. The court will address hearsay objections to specific evidence in detail below. Defendants also assert that if the court finds any hearsay statement admissible under an exception, the admission of such statement violates the Confrontation Clause due to the fact that Kesey passed away in 2001 and is not available for cross examination. FED. R. EVID. 804. The Confrontation Clause, which originates from the Sixth Amendment, applies only to criminal matters. *See Austin v. United States*, 509 U.S. 602, 608 n.4 (1993)(noting prior decision holding that the Confrontation Clause does not apply in civil cases); *United States v. Alisal Water Corp.*, 431 F.3d 643, 658 (9th Cir. 2005)(same); *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1287 n.13 (11th Cir.

---

[12]Again, the court addresses Defendants' relevance objection to this evidence, below.

2001)("Of course, the Confrontation Clause is not applicable to civil cases."). Thus, Defendants' Confrontation Clause objection to hearsay evidence admitted in this, a civil case, is overruled.

F. Request for Judicial Notice

Finally, Defendants object to the court's consideration of the terms of the settlement between Plaintiff and the Wilson Defendants as set forth in the stipulated judgment filed with the court on September 12, 2007. Rule 201 of the Federal Rules of Evidence allow a court to take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Documents previously filed with the court in the instant litigation are subject to judicial notice. *See Asdar Group v. Pillsbury, Madison and Sutro*, 99 F.3d 289, 290 n.1 (9th Cir. 1996)(taking judicial notice of facts contained in complaint and prior court orders in case). However, the court may not judicially notice the truth of the disputed facts contained in such document. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). In this instance, the court will take judicial notice that Plaintiff and the Wilson Defendants filed Exhibit JJ representing that they have settled their issues relating to this litigation but it will not judicially notice the truth of Wilson's statement in that document that Plaintiff is the owner of the rights to the Screenplay. Ownership of the Screenplay is disputed – indeed, it is the question this court must ultimately decide. As *Lee* instructed, the court here should not judicially notice facts in dispute. Accordingly, Defendants' objections are sustained to this extent.

Defendants also object to the court's judicial notice of the characterizations made by Kesey and Faye with regard to the ownership of the Novel in their filings with the U.S. Copyright Office identified as Exhibits M and O. Again, and for the reasons stated above, the court will take judicial

notice that the documents were filed but will not judicially notice the truth of the representations in those documents that Kesey owned the copyrights to the Novel.

*Specific Evidentiary Objections*

Both parties have presented numerous evidentiary objections generally made at trial, where the court has an opportunity to hear the objection as well as the response and the purpose for which the evidence is being offered. Here, however, the parties have raised their objections and provided a very brief, if any, discussion of the authority supporting each objection. Nonetheless, at the summary judgment stage the court still must determine whether the evidence the parties offer meets the admissibility standards or Rule 56(e).

A. Standards

At the summary judgment stage, the court must look at the evidence presented to it by the parties and, initially, determine if there is a genuine issue of material fact. While engaging in this task, the court must necessarily apply the underlying summary judgment when it encounters evidence that is irrelevant, speculative, ambiguous, argumentative, or constitutes a legal conclusion exclusively within the purview of the court's consideration. *See Burch v. Regents of Univ. of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal 2006)(noting that various evidentiary objections, such as relevance, were redundant at the summary judgment stage where the court can award summary judgment only in the absence of a genuine issue of material fact based on evidence the contents of which must be admissible). It is a waste of the court's time to analyze the parties' objections to the evidence on any of these grounds independently of its consideration of the merits of the underlying summary judgment motions. The court finds these objections redundant to the court's ultimate determination of whether a genuine issue of material fact exists and that any

discussion of the objections at this juncture would be superfluous. Accordingly, the court will not address these objections in detail in this Opinion.

The same can not be said of objections that are based on the admissibility of the evidence, such as authentication objections, which the court has already considered in detail, or hearsay objections. The Ninth Circuit generally has applied the limitations found in the hearsay rule, set forth in Rule 802 of the Federal Rules of Evidence, to evidence offered by the parties at the summary judgment stage. *Orr*, 285 F.3d 764, 778; *Beyenne v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). Similarly, the Ninth Circuit requires that affidavits offered in support of summary judgment be based on personal knowledge. *Bliesner v. The Communication Workers of America*, 464 F.3d 910, 915 (9th Cir. 2006).

Plaintiff objects to the consideration of various statements contained in Francis's three affidavits on the grounds that the statements are not based on personal knowledge and, therefore, lack the proper foundation or are hearsay and do not qualify for an exception. Plaintiff asserts similar objections to the evidence identified by Defendants as support for Defendants' Facts. Defendants object to statements contained in the affidavits of Faye Kesey, Ken Babbs, and Irby Smith for the same reasons. Defendants also object to a number of Exhibits offered by Plaintiff. The court will address each of the statements and exhibits and the objections thereto below.[13]

Hearsay is defined as an out of court statement offered in evidence to prove the truth of the matter asserted. FED. R. EVID. 801. Hearsay is admissible only if it qualifies as an exception to the

---

[13]To the extent either party also objects to evidence on grounds that the evidence is a legal conclusion, is vague or ambiguous or is irrelevant, the court will not address the objections in this Opinion but will consider the objections when viewing the evidence to determine whether a genuine issue of material fact exists, in addressing the parties' substantive arguments in its Findings and Recommendations.

general hearsay rule. Federal Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The evidence establishing personal knowledge of the matter may consist of the witness's own testimony. *Id.*

B. Discussion

1. Francis Affidavit signed June 16, 2008

a. paragraph 2

Paragraph 2 of Francis's affidavit, signed June 16, 2008 (the "First Francis Affidavit"), provides:

> That Affiant in summer or early fall 1983 told Mike Hagen of the main ideas for the story "Last Go Round" as Affiant got information for this screenplay from a newspaper article and also from a cowboy named Marty Wood and Affiant also took pages and pages of interviews in 1983-87 from several now unknown persons on the Umatilla and other Indian reservations that had knowledge related to the Indian character (Jackson Sundown), the African American character (George Fletcher) as well as from several other prominent professional rodeo cowboys such as Chris Libbert, Roy Cooper, Marty Henson, a black cowboy named Charlie Samson, and the Severe Brothers family (long-time Pendleton Oregon rodeo saddle makers) as well as interviewed relatives of the lead character John Spain. That Affiant no longer has these voluminous notes. That the main ideas for this story "Last Go Round" involved the mentoring relationship between the black man (George Fletcher), the Nez Perce Indian character (Jackson Sundown), and the "coming of age" of the white cowboy (John Spain) which was the real storyboard of the screenplay as well as the context of the climactic scene (i.e. the protagonist of the screenplay is John Spain and the real conflict involves the judges awarding the bronc riding trophy to Spain, when the crowd felt that it should have gone to the black man, George Fletcher); Hagen did not know any of these details until Affiant shared them with him.

Plaintiff objects to the statement that Hagen did not know of the details of the 1911 Round-Up until Francis shared them with him. Plaintiff argues that Francis lacks the foundation to support her statement about what Hagen did or did not know. The court agrees. Francis did not present

evidence that she was personally aware of the extent of Hagen's knowledge regarding the details surrounding the 1911 Pendleton Round-Up, nor did she state that Hagen made such a statement to her before she shared her information with him. Accordingly, the statement lacks a proper foundation. Plaintiff's objection is sustained and the statement is stricken from the record.[14]

b. paragraph 3

Plaintiff objects to Francis's statement found in paragraph 3 of the First Francis Affidavit that Kesey was not aware of the relationship between Sundown, Fletcher, and Spain before his discussions with Francis and Hagen in December 1983.[15] Plaintiff argues that Francis lacks foundation for this statement and that evidence exists to establish that Kesey knew of the story behind the 1911 Pendleton Round-Up as early as Fall of 1979. Paragraph 3 provides:

> That after Affiant discussed these ideas with Hagen and conducted research, they brought these ideas to Ken Kesey in about December 1983 when they first discussed the idea of asking Kesey to write a screenplay for a corporation which Affiant indicated would be called "Sundown & Fletcher Inc.". At that time, Kesey admitted not knowing about the relationship between the black man, the Indian man and the "coming of age" of the white cowboy which was the real "juice" of the story as well as that Kesey admitted that he did not know the climax of the story nor of the main character John Spain as set forth above. Hagen and Francis informed Kesey in detail as to the history of the three main characters and provided photographs of them. Hagen and Francis purchased historical and rodeo nonfiction books and sent Ken Kesey packages of photos, historical information, rodeo and horsemanship terminology of the time and other information about the Pendleton Round-Up and geography of that area.

In this paragraph, Francis asserts that Kesey admitted to having no knowledge of the

[14]Plaintiff's objections to this evidence as conclusory and speculative are moot.

[15]Plaintiff also objects to Defendants' reliance on pages 9-10 attached to the Index, which is an excerpt from Francis's deposition, as evidentiary support for this statement. The court has already determined that this evidence was not properly authenticated and has stricken pages 9 and 10 from the record.