FILED
AUG 1 7 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KESEY, LLC, an Oregon Limited Liability
Company,

                              Plaintiff,

        v.

MICHELLE FRANCIS, aka MISCHELLE
McMINDES, an individual; MIKE HAGEN,
an individual; KATHERINE WILSON, an
individual; SUNDOWN & FLETCHER, INC.,
an Oregon corporation; ASSOCIATES FILM
PRODUCER SERVICES, an Oregon
partnership or other business entity; and DOES
1 through 100, inclusive,

                              Defendants.

CV. 06-540-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

        This lawsuit raises the question of who owns the rights to the screenplay written in 1984 by

Page -1- FINDINGS AND RECOMMENDATION                                    {SIB}

well-known author Ken Kesey ("Kesey") about the 1911 Pendleton Round-Up entitled the "Last Go Round" (the "Screenplay"). The Screenplay recounts the story of the relationship between Jackson Sundown, an American Indian; George Fletcher, an African American; and Johnathan E. Lee Spain, a young white man from Nashville, Tennessee, all of whom competed for the silver-adorned saddle awarded to the first World Champion All Round cowboy. The story unfolds through the eyes of a much older Spain on a return trip to Pendleton, Oregon, to attend the Round-Up.

Currently before the court are the parties' cross-motions for summary judgment. The court has previously addressed and decided the myriad of evidentiary objections asserted by the parties. *See Kesey, LLC v. Francis et al.*, 06-540-AC, 2009 WL 909530 (D. Or. April 3, 2009). This decision considers the merits only in light of that evidence previously found to be admissible.

*Background*

As is the case for most writers, Kesey was always on the lookout for inspiration for a new project. In the 1970s, he recognized the potential of the Pendleton Round-Up, an event which he had attended numerous times, as the backdrop for a good story. (Norma Faye Kesey Decl. ("Faye Decl.") ¶ 3.) About that time, he shared the story of the 1911 Pendleton Round-Up, and the competition between Sundown, Fletcher and Spain, with good friend Ken Babbs ("Babbs"). (Babbs Decl. ¶ 3.) In 1979, Kesey and Babbs traveled to Pendleton to attend and research the Round-Up as the setting for a possible motion picture. (Babbs Decl. ¶ 4.) Mike Hagen ("Hagen"), Kesey's college fraternity brother, joined up with Kesey at the Round-Up. (Aranoff Decl. Exh. A at 1.) During the trip, Kesey discussed his interest in writing a screenplay about the Pendleton Round-Up featuring Sundown, or one of his descendants, with newspaper reporter Bob Crider. (Babbs Decl. ¶ 4.) Crider wrote two articles recounting his conversation with Kesey which appeared in the *East*

*Oregonian* on September 15, 1979. (Aranoff Decl. Exh A.)

The motivation, or opportunity, to write about the Pendleton Round-Up and Jackson Sundown presented itself in December 1983, when Michelle Francis ("Francis")[1] and Hagen approached Kesey on behalf of Sundown & Fletcher, Inc. ("S&F"), a corporation they[2] created and, eventually incorporated on May 14, 1984 (Aronoff. Decl. Exh. Y), to market and license the Screenplay, and asked him to write the Screenplay. (Francis Depo. Vol. I 11:1-12; 24:25-25:25, March 20, 2007.) Kesey agreed and recruited his friend Irby Smith ("Smith"), who was experienced in the motion picture industry, to help him write the Screenplay. (Smith Decl. ¶3; Hagen Depo. 42:6-17.)

On January 5, 1984, Hagen signed a check[3] made out to Kesey in the amount of $5,000, which Kesey negotiated on January 12, 1984. (Aronoff Decl. Exh. Z at 1-2.) Kesey arranged for Smith to be paid $3,000 for his services. (Smith Decl. ¶ 5.) So, on January 8, 1984,[4] Francis signed a check on behalf of S&F made out to Smith in the amount of $3,000. (Aronoff Decl. Exh. Z at 3.) On the front of the check was a note that read: "1 month salary for development of script and project." That notation could have been added by Francis after the check was cashed as part of her bookkeeping process. (Francis Depo. Vol. I 74:10-75:1.) Smith negotiated the check on January 8, 1984. (Aronoff Decl. Exh. Z at 4.)

---

[1] Michelle Francis was also known as Mischelle McMindes and signed documents relevant to this action using that name. She will be referred to as Michelle Francis throughout this Opinion.

[2] Kendall Early was also a co-founder of S&F but is not involved in this litigation.

[3] This check may have been signed on January 8, 1984, and inadvertently misdated. (Francis Depo. Vol. I 60:11-21.)

[4] The January 8, 1983, date on the check is in error. (Francis Depo. Vol. I 108:24-109:5.)

Shortly after agreeing to write the Screenplay and receiving the first payment, Kesey drafted a letter setting forth the agreement between the parties (the "Letter"). (Hagen Depo. 30:11-24.) The Letter, which was dated January 8, 1984, read:

> To Whom it May Concern:
>
> I have agreed to write a screenplay about bygone rodeo greats Jackson Sundown and Nigger George Fletcher, concerning their historic confrontation at the Pendleton Round-Up in 1916.[5] The name of the production company that I am writing for is SUNDOWN FLETCHER INC. and the people I am dealing with are Mike Hagen and Mischelle McMindes.

The Letter was signed by Kesey. (Aronoff Decl. Exh. D.)

Kesey worked on the Screenplay for the better part of 1984, initially with the assistance of Smith and then alone. (Smith Decl. ¶ 4, Faye Decl. ¶ 4.) Kesey compiled all of the research notes he created while attending numerous Pendleton Round-Up's, as well as character sketches and story outlines he had written. (Faye Decl. ¶ 4.) Additionally, Francis, who spent four[6] years researching the events of the 1911 Round-Up and the relationship between Sundown, Fletcher, and Spain, shared historical, geographical, and background information, in addition to photographs, books, and rodeo terminology, with Kesey. (Francis Aff. dated June 16, 2008 ("First Francis Aff.") ¶ 2.)

During the first few months of 1984, Kesey and Smith worked side-by-side on a computer in Kesey's home in Pleasant Hill, Oregon, and completed almost half of the Screenplay. (Smith Decl. ¶ 4.) Virtually all of the essential elements of the Screenplay were in place by this time,

---

[5]The Screenplay is about the 1911 Round-Up, not the 1916 Round-Up. Neither party disputes this fact, though neither offers an explanation for the discrepancy.

[6]Francis states that she researched the background for the Screenplay from 1983 to 1987 even though she provided such information to Kesey in December 1983 and the Screenplay was completed in September 1984.

including the plot, sequence of events, characters, mood, tone, setting, and pace. (Smith Decl. ¶ 4.)
Thereafter, Kesey continued working on the Screenplay without Smith, who became busy with other
motion picture projects. (Smith Decl. ¶ 4.) Kesey completed the final draft of the Screenplay in
September 1984 and delivered a copy to S&F during the 1984 Pendleton Round-Up at a party hosted
by S&F. (Francis Depo. Vol. I 113:3-9.) The copy of the final draft of the Screenplay offered as
evidence by both parties contains the notation "© Ken Kesey 1984" with "Ken Kesey" typed and the
"©" and "1984" handwritten.[7] (Arnoff Decl. Exh. C; S&F Defs.' Index of Evidence in Supp. of
Their Concise Statement of Facts ("Defs.' Index") at 58.) On September 16, 1984, Francis signed
a check in the amount of $5,000 payable to Kesey, which Kesey negotiated on September 21, 1984.
(Aronoff Decl. Exh. Z at 1-2.)

Concurrently with the writing of the Screenplay, S&F was creating a brochure to be used to
promote the Screenplay (the "Brochure"). (Francis Depo. Vol. II 113:7-15:16, May 8, 2008.) The
final version of the Brochure, which was given to those attending the S&F party at the 1984
Pendleton Round-Up, identified the Screenplay as a "Screenplay in progress by Ken Kesey and Irby
Smith" and included the designation "© Ken Kesey 1984" in the upper right-hand corner of the two-
page spread describing the Screenplay. (Francis Depo. Vol. II 17:25-18:9; Aronoff Decl. Exh. V.)
Francis did not see the final proofs of the brochure containing the copyright designation and would
not have approved its inclusion. (Francis Aff. dated July 1, 2008 ("Second Francis Aff.") ¶ 2.)

Other than the $10,000 paid to Kesey and the $3,000 paid to Smith, Kesey and Smith were
not paid and were not entitled to a salary from S&F. S&F did not provide Kesey or Smith with

---

[7]The declarants referring to this copy of the Screenplay do not represent that it is the version
of the Screenplay delivered to S&F in September 1984. Accordingly, the court does not view this
exhibit as evidence that the copyright designation was on the original version given S&F at that time.

health care or other employment benefits. (Hagen Depo. 36:22-38-12, 42:18-44:20; Francis Depo. Vol. I 99: 24-100:14.) S&F did not withhold taxes or social security from the monies paid to Kesey and Smith, did not supervise the work done on the Screenplay, and had no right to assign additional projects to Kesey or Smith. (Smith Decl. ¶ 5; Hagen Depo. 36:22-38-12, 42:18-44:20; Francis Depo. Vol. I 101:17-103:4.) Kesey was not given any business title or position with S&F. (Faye Decl. ¶ 6; Hagen Depo. 36:22-38-12.)

The proper characterization and effect of the money paid to Kesey and Smith is in dispute. Smith understood that the payments were:

> essentially a form of earnest money – designed to indicate S&F's desire to acquire rights in the Screenplay that would have to be negotiated and memorialized in formal signed agreements providing for, among other things, much more substantial compensation to us, such as participation in profits from the film.

(Smith Decl. ¶ 5.) In recounting a conversation she had with Francis about the payments, Norma Faye Kesey, Kesey's wife, ("Faye")[8] stated that:

> Initially, Francis told me that these payments were made as an inducement for Ken to work on "Last Go Round" instead of "Sailor Song," a novel Ken had started on about the same time; later Francis told me that this money was a down payment on the six-month option on the Screenplay that Francis later proposed.

(Faye Decl. ¶ 6.) However, in her deposition, Francis stated that she thought S&F was paying Kesey and Smith to write the Screenplay for S&F and that the corporation would own all rights to the Screenplay. (Francis Depo. Vol. I 31:15-32:14.) At his deposition, Hagen referred to the initial payment of $5,000 to Kesey in January 1984 as "kind of a kick-start to get the process going." (Hagen Depo. 39:25-40:7)

---

[8]While the legal name of Kesey's widow is Norma Faye Kesey, she is referred to as Faye throughout the pleadings because she identifies herself using her middle name.

In September 1984, about the time Kesey completed the Screenplay and delivered a final draft to S&F, Francis began corresponding with Faye and Sue Kesey, Kesey's sister, about S&F's desire to obtain a six-month option to purchase the Screenplay. (Faye Decl. ¶ 8). On September 30, 1984, Francis sent a letter to Faye forwarding copies of unrelated option/purchase agreements and discussing the terms of a proposed agreement between S&F and Kesey allowing S&F to attain the rights to the Screenplay. (Faye Decl. ¶ 8.) The letter read, in pertinent part, as follows:

Dear Faye,

Ken asked me to direct the contract papers and questions to Sue Kesey while he was here during the Round-Up. Since you do the books for you and Ken I feel that we should begin with you [receiving] agreement information also.

I am sending copies of some recent correspondence with Sue. This includes copies of other option/purchase arrangements from unrelated projects that Sue requested for the purpose of familiarizing herself with the language and format.

At the Bill Graham tribute Ken said that he wanted 2 1/2 percent of the producers' gross instead of the net. That is a considerable change. We will agree to put that in our agreement and then negotiate for that position for Ken when we form an alliance with our "line producers."

Please consider the revised agreement that you will receive in a few days. We cannot move forward (i.e. solicit funds or seriously negotiate) without the fundamental agreement between S&F, Inc. and Ken. The sooner we get an agreement the more likely we can reach our goal of filming next Round Up. I will be sending copies of all my contract related correspondence to both you and Sue until I hear that there is a more beneficial and expedient method. I also will be going over your letters on the agreements with:

> Steve Corey
> 222 SE Dorion
> Pendleton, Or 97081

He will be formalizing our agreements after we make the preliminary decisions. Feel free to get in contact with him if necessary.

· · ·

I hope we can get these arrangements done as soon as possible. At that time we can write the check for $10,000 and begin the option period. Thank you for your help in this matter – I hope the initial agreement you [receive] will be able to be negotiated to comfortable terms for you and Ken.

(Aronoff Decl. Ex. E.)

Francis forwarded the revised agreement discussed in the letter of September 30, 1984, to Faye on October 4, 1984. The cover letter read:

Enclosed is the agreement w/ 2 1/2 of producers gross. I have a couple investors waiting for your terms and signatures. Also, Carey Williams has a production company interested in discussing this as soon as we secure agreements.

(Aronoff Decl. Ex. F at 1.)

The enclosed "Deal Memo Option/Purchase Agreement" provided for the sale of a six-month option to the motion picture rights of the Screenplay from Kesey to S&F in exchange for a payment of $20,000, $10,000 of which consisted of the two $5,000 payments already paid to Kesey and the remainder to be paid after the signing of the agreement. The option could be extended by S&F for $1,000 per month for an indefinite period. If the option was exercised, Kesey was entitled to $50,000, plus either $25,000 or $50,000, depending on the final approved budget of the motion picture, and 2 1/2 percent of the producer's gross profits as defined in the agreement. (Aronoff Decl. Ex. F at 2.) Kesey was designated as the "Owner" of the Screenplay and, by signing the agreement, would represent and warrant that he was "the sole owner of all rights in the Property which are optioned and has the full and sole right and authority to convey the same." (Aronoff Decl. Ex. F at 2, 5.) Kesey would retain all publication rights to the Screenplay, as well as stage, television, and radio rights, limited to some degree by time restrictions and rights of first refusal. (Aronoff Decl. Ex. F at 1-2.)

*{SIB}*

Ultimately, Kesey never signed any agreement conveying motion picture rights in the Screenplay to S&F. (Faye Decl. ¶ 9; Francis Depo. Vol. I 140:20-25.) However, Kesey did assist S&F in marketing the Screenplay to interested parties by attending meetings arranged by Francis. (Francis Aff. ¶5.)

On August 14, 1990, S&F entered into an agreement to option its rights in the Screenplay to Katherine Wilson ("Wilson") through her company Associates[9] Film Producers Services ("Associates")(collectively the "Wilson Defendants"). The agreement provided for a one-year option at a price of $10,000, with the right to extend the option an additional year for $1.00. If Associates elected to exercise the option, Associates would receive motion picture, sequel, remake, television, film, and series rights to the Screenplay for a purchase price of $65,000. (Aronoff Decl. Exh. W.) On July 13, 1991, S&F was involuntarily dissolved as a Oregon corporation by the Oregon Secretary of State. (Aronoff Decl. Exh. Y.) Francis continued to do business as S&F even after the corporation was dissolved, acting both for herself, as a 1/3 owner of S&F, and for Kendall Early, a 1/3 owner of S&F, by virtue of a power of attorney. (S&F Defs.' Answer ¶ 4.)

On August 12, 1992, S&F and Associates entered into a virtually identical agreement extending the option period for one and one-half years at a cost of $200 with a right to extend another year for $100. The original purchase price of $65,000 was increased by approximately $35,000 to cover S&F's development costs from January 1984 to August 1992. (Aronoff Decl. Exh. X.) It is possible that S&F received the $10,000 payment for the option from the Wilson Defendants. (Francis Depo. Vol. II 18:17-19:19.) At some point thereafter, S&F did receive an option payment

---

[9]The pleadings and documents filed in this case refer to this defendant as both "Associates Film Producers Services" and "Associated Film Producers Services." To be consistent, the court will refer the corporation as Associates, which is how the defendant is identified in the court caption.

of $30,000 from Stephen Fromkin and Scott Maginnis related to the Screenplay. (Francis Depo. Vol. II 20:1-25.)

Associates also attempted to obtain an option for the Screenplay from Kesey in 1990. Wilson met with Kesey and Faye and disclosed her interest in assuming S&F's position with regard to the Screenplay. (Wilson Depo. 41:3-42:1.) Kesey gave her his blessing and advised her to contact Smith as well. (Wilson Depo. 41:11-42:1.) Wilson and Kesey then negotiated the terms for an option agreement which identified Kesey as the "Writer" of the Screenplay and represented that the Writer was "the sole owner of all rights in the [Screenplay] and has the full and sole right and authority to convey same." (Wilson Depo. 40:21-41:2, 42:2-18, Aranoff Decl. Exh. DD at 1, 3.) The proposed agreement, which was signed by Wilson on December 11, 1990, was then signed by Kesey on the back of the last page. (Aranoff Decl. Exh. DD.) Initially, Kesey was unwilling to sign the agreement and asked Wilson to sign for him. When Wilson questioned her authority to do so, Kesey turned the agreement over, signed the back and said "Here. Now you can say I've signed it." (Wilson Depo. 44:3-45:12.)

In 1991, Kesey and Babbs initiated work on a novel that told the same story in the same manner as the Screenplay and was also entitled "Last Go Round" (the "Novel"). (Babbs Decl. ¶ 6.) At some point, the two discussed the possibility that the Novel might become the basis for a motion picture based on the 1911 Pendleton Round-Up. (Babbs Decl. ¶ 5.)

In early 1994, as the Novel was nearing completion and publication was imminent, Kesey and his attorney became aware that the Wilson Defendants were claiming ownership of the Screenplay and planned to block the publication of the Novel. Lawrence Rose, Kesey's attorney, contacted Wilson directly to discuss the Wilson Defendants' claims and plans. Rose then forwarded

a letter to William Skrzyniarz, attorney for the Wilson Defendants, contesting the claims of

ownership with regard to the Screenplay. The letter, dated February 8, 1994, read:

> We represent Ken Kesey, and are writing regarding your client, Katherine Anne Wilson.
>
> Ms. Wilson claims to have acquired motion picture rights to a project originated and written by Kesey entitled "The Last Go Round", scheduled to be published in novel form this year. She has met with various parties for the purpose of procuring financing for a feature film based on this property and has generally held herself out to the motion picture community as the "producer" of the project and rightsholder.
>
> I spoke with Ms. Wilson last week before learning of your involvement. She concedes she has no rights other than motion picture rights to an early screenplay version of this project written by Kesey; that she has no rights to the novel or any other version written by Ken. She insisted she was the "producer" of a film version of the project – a film that would necessarily in-fringe upon Kesey's rights to the novel, even assuming her claim to the screenplay rights were true, which our client vigorously denies. Ms. Wilson told me she has written contracts that she will forward to me that substantiate her claim of rights, though nothing has been received to date. (She noted, however, that Ken specifically refused to sign one of the agreements and placed his signature on the back of it expressly as a "sample" of what it would look like were he ever to sign an agreement.)
>
> It is our client's position that Ms. Wilson owns no rights in this project whatsoever, that he is the sole proprietor of all such rights; and that her unauthorized actions in purveying or attempting to purvey such rights, as well as holding herself out as its "producer", constitute copyright infringement, unfair competition, trademark disparagement, defamation, interference with third party relations, interference with contract and other actionable harms.
>
> Accordingly, demand is hereby made that your clients cease and desist from holding herself out as the producer and owner of this property or any rights therein and that she cease all dealings with third parties of every kind with respect thereto. Our client wishes for us to emphasize, in no uncertain terms, that he is fully prepared to undertake all actions he deems necessary or desirable to stop her actions and protect his rights in the premises, including without limitation litigation and injunctive relief.

(Aronoff Decl. Exh. I.) Skrzyniarz replied in a letter dated February 18, 1994, that: "The short

answer to your substantive letter is that my client does have ownership of Ken Kesey's 'Last Go Round' script upon which his book is based, and therefore Mr. Kesey may not publish the book without her permission. We will seek and swiftly obtain an injunction if the novel is released." (Aronoff Decl. Exh. J.)

On March 24, 1994, Associates registered a copyright in the Screenplay with the United States Copyright Office listing S&F as both the copyright claimant and the author of the entire text. A box indicating that the Screenplay was created as a work for hire was checked. (Aranoff Decl. Exh. L.) While Francis signed the registration form as the authorized agent of S&F, she admitted in her deposition that neither she, Hagen or Kendall Early considered themselves to be authors of the Screenplay (Francis Depo. Vol. II 64:20-68:2.)

By letter dated May 6, 1994, Skrzyniarz advised Rose that the Wilson Defendants were willing to release print publication rights to the Novel if Kesey would waive all other rights in the Novel, as well as all rights in the Screenplay. Associates was also willing to consider Smith for the position of executive producer and Kesey's daughter, Shannon Kesey Smith ("Kesey-Smith"), for the position of associate producer of the Screenplay. In the event the offer was not accepted within seven days, Associates would seek to enjoin the distribution of the Novel. (Defs.' Index at 115.) After an exchange of correspondence in which the attorneys asserted their respective clients' position without any agreement, Skrzyniarz requested in a letter dated May 17, 1994, that Rose contact the publisher of the Novel and "delay publication of the novel until this dispute is resolved." He then advised that failure to delay publication would result in grave and irreparable harm to the Wilson Defendants and would prompt legal action. (Defs.' Index at 120.) Two days later, Rose informed Skrzyniarz that Kesey refused to take such action:

Our client refuses to contact the publisher about any kind of publication delay or cessation and has asked that you be placed on notice that any attempt by you or your clients to interfere with any future or continued publication of the novel will, among other actionable harms, constitute interference with business relations, interference with prospective business, defamation, etc.

(Defs.' Index at 123.)

The Novel was eventually published on July 4, 1994, and received favorable reviews. (Aranoff Decl. Exh. M, Babbs Decl. ¶ 7, Aranoff Decl. Exh. H.) On September 14, 1994, Penguin USA registered a copyright in the Novel with the United States Copyright Office listing Kesey as the copyright claimant and Kesey and Babbs as co-authors of the entire text. (Aranoff Decl. Exh. M.) The Wilson Defendants did not take any steps to protect their rights to the Screenplay. Additionally, after the Wilson Defendants' option on the Screenplay expired in September 1995, S&F failed to take any action to assert a copyright infringement claim based on the publication of the Novel. (Francis Depo. Vol. II 59:2-8.) Francis stated that this was a business decision based on the hopes that the publication of the Novel would be helpful to S&F's attempts to market the Screenplay. (Francis Depo. Vol II 59:9-12.)

Kesey died intestate on November 10, 2001. (Faye Decl. ¶ 15.) On February 26, 2003, Kesey's heirs, consisting of his widow, Norma Faye Kesey, and his children, Kesey-Smith, Zane Kesey, Sunshine Kesey, and Clare Pederson, agreed in writing that 50 per cent of the estate would pass to Faye and that the children would receive equal shares of the remaining 50 per cent of the estate ("Agreement between Heirs"). (Aranoff Decl. Exh. R at 2.) Kesey's heirs also agreed to contribute their interest in all intellectual property to a limited liability corporation formed for the sole purpose of holding and handling Kesey's intellectual property. (Aranoff Decl. Exh. R at 3.) On March 10, 2003, the court probating Kesey's estate issued a decree of final distribution in accordance

with the terms of the Agreement between Heirs.

Kesey's heirs formed Kesey, L.L.C., an Oregon limited liability corporation in mid-March 2003[10] ("Plaintiff"). Each of the heirs were identified as members of Plaintiff and Faye was designated as the initial manager. (Aranoff Decl. Exh. N.)

Faye, as personal representative of Kesey's estate, signed a Transfer of Copyrights "assigning all of Assignor's Interests in all copyrights in which Ken E. Kesey claimed an interest" to Plaintiff. (Aronoff Decl. Exh. O.) The Transfer indicated that it was to be effective March 10, 2003, but that it was not signed and notarized until May 14, 2003. (Aronoff Decl. Exh. O.) On April 14, 2003, Faye, again in her capacity as personal representative of Kesey's estate, signed a copyright registration form acknowledging the assignment of Kesey's copyrights interests to Plaintiff and registered the assignment with the United States Copyright Office on June 5, 2003. (Aronoff Decl. Exh. O.) About this time, Faye became aware that S&F had filed a certificate of registration form asserting ownership of the Screenplay. (Faye Depo. 33:23-34:7.) However, Kesey-Smith had learned of the existence of S&F's copyright registration more than a year earlier, in February 2002, as a result of a copyright registration search conducted in conjunction with the possible sale of an option on the Screenplay to Wieden & Kennedy. (Kesey Smith Depo. 23:18-25:21.)

S&F did not file a claim against Kesey's estate or otherwise participate in the probate of Kesey's estate. (Faye Decl. ¶ 17.) However, on December 13, 2004, Michael Kratville, S&F's legal counsel, wrote to Sterling Lord, Kesey's literary agent, as well as David Skinner and the law firm of Klarquist, Sparkman, asserting that S&F owned all rights in the Screenplay. Kratville stated that:

---

[10]Only two heirs dated their signature page. The pages were signed on March 13, 2003, and March 17, 2003.

We are writing today on behalf of Sundown and Fletcher, Inc. which owns the screen rights to the screenplay written as a work for hire by Ken Kesey in 1983-84 entitled "Last Go Round".

We understand that some of your clients have or are contemplating entering into a contract concerning this screenplay and we think it is imperative that all of you understand that my client holds all of the legal rights to that screenplay.

The screenplay was a work for hire in which my client hired Ken Kesey as evidenced by the attached checks dated in 1983 and 1984. In 1984, Ken requested the assistance of Irby Smith to help write the screenplay. Sundown & Fletcher Inc then paid Irby Smith $3000.00 for one month's work collaborating with Ken Kesey on the screenplay. As a work for hire, neither Mr. Smith nor Mr. Kesey (or his estate) have any rights to the underlying screenplay. Additional proof of the parties' relationship is enclosed in the form of newspaper articles.

Not only was this a work for hire, but my client, via their agents, copyrighted this screenplay in 1994. A revised screenplay was then copyrighted in 1994 by an entity which then held the option to my client's rights; which option expired in the 1990s and thus reverted to my client upon its expiration.

. . .

If you believe that there is a legal basis to conclude that anyone other than my client holds the rights to this screenplay (and all of its versions), we would ask that you reply immediately to inform us of the basis for any claim which may be asserted by any other person or party. We would ask that you not only inform us of any person or entity which you think may have a claim, but more importantly, of any facts which would support a position that this was not a work for hire. We would assume that if we agree that this was a work for hire that there would also be agreement that my client would hold all rights. Thus, only if there is a factual dispute related to this being a work for hire would there be any further issue to discuss.

(Aronoff Decl. Exh. T.) Plaintiff's attorney, David Aronoff, responded to the letter the following year and objected to S&F's claim of ownership. In a letter dated October 14, 2005, Aronoff explained that:

As you should be aware, Ms. Kesey is the widow of Ken Kesey and holds the controlling interest in Mr. Kesey's Estate. In these capacities, Ms. Kesey is the successor-in-interest to the rights of Ken Kesey in the screenplay entitled "Last Go Round" ("Screenplay").

In your letter dated December 13, 2004, you assert that Mr. Kesey wrote the Screenplay as a "work-for-hire" in which the copyright purportedly is owned and controlled by your client, Sundown & Fletcher, Inc. ("S&F"). This assertion is patently incorrect. The Screenplay is exclusively owned and controlled by my clients. Any further actions by S&F – or anyone else – in wrongfully asserting rights in the Screenplay, or in otherwise interfering with my clients' exclusive ownership of the copyright and all other rights associated with the Screenplay, will result in an appropriate legal action being filed by my clients to obtain, among other things, injunctive and declaratory relief, as well as monetary damages.

(Aranoff Decl. Exh. U.) Aranoff then presented legal arguments supporting his position that Plaintiff owned all rights to the Screenplay and concluded with:

Finally, our letter concludes by stating that your client "is pursuing its options with various studios . . . and will continue to do so . . . ." Please be advised that any such conduct by your client, as well as any other assertion of rights by your client in the Screenplay, is damaging my clients and is wrongfully interfering with their prospective economic advantages as the true holders of the copyright and all other rights in the Screenplay. Accordingly, demand is hereby made that your client immediately cease and desist from any conduct under which it is claiming rights in the Screenplay. If your client does not do so, my clients will have no choice but to commence appropriate legal action seeking, among other things, monetary, injunctive, and declaratory relief.

We look forward to your prompt assurances that your client will immediately cease and desist from the above-described conduct. Should we not expeditiously receive such assurances, based on your statement that your client is pursuing its options with various studios . . . and will continue to do so ," my clients may have no choice but to begin appropriate legal proceedings.

(Aronoff Decl. Exh. U.)

Smith quitclaimed his interest in the Screenplay to Plaintiff on April 11, 2006. (Smith Decl. ¶ 7, Aronoff Decl. Ex. B.) On April 21, 2006, Plaintiff filed this action against Francis, Hagen and S&F (collectively the "S&F Defendants") asking the court to determine who owns the rights to the Screenplay and seeking damages for interference with Plaintiff's attempts to market the Screenplay.[11]

---

[11]Plaintiff also named the Wilson Defendants as defendants in this action. Plaintiff and the Wilson Defendants resolved their dispute and filed a stipulated motion for judgment on September

At that time, Faye was still acting as manager of Plaintiff. (Kesey Decl. ¶ 2.)

## Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

---

10, 2007. The Wilson Defendants remain in the case as cross claimants. Additionally, Plaintiff names Does 1 through 100 as defendants. "As a general rule, the use of 'John Doe' to identify a defendant is not favored. However, situations arise, such as the present, where the identity of alleged defendants will not be known prior to the filing of a complaint. In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). Here, even if Plaintiff could not have known the identities of the Doe defendants when it filed the complaint in April 2006, Plaintiff has been afforded ample opportunity to discover their identities and has not specifically named them. Accordingly, Does 1 through 100 should be dismissed at this time.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

## *Discussion*

In its complaint, Plaintiff alleges that it is the exclusive owner of the Screenplay and all rights related thereto under the Copyright Act (17 U.S.C. §§ 101 et seq.)(the "Act") as successor-in-interest to Kesey and Smith's rights in and to the Screenplay. In Count I, Plaintiff seeks a judicial declaration establishing that Plaintiff owns all such rights, that the S&F Defendants have no rights in the Screenplay, and that the Letter is neither a work-for-hire agreement nor a valid instrument of transfer under the Act. Plaintiff asserts claims for both intentional and negligent interference with prospective business advantage in Counts II and III, respectively, and seeks money damages on these claims. In their answer, the S&F Defendants deny that Plaintiff is the owner of the Screenplay,

*{SIB}*

contend that S&F owns all rights in and to the Screenplay, and assert counterclaims for copyright infringement based on the publication of the Novel and attempts by Plaintiff to market the Novel and Screenplay.[12] S&F also seeks restitution of all monies it expended to market the Screenplay based on Kesey and Smith's holding themselves out as work-for-hire employees. The Wilson Defendants assert cross-claims against the S&F Defendants for misrepresentation, intentional interference, and breach of contract.

At this time, both Plaintiff and the S&F Defendants move for summary judgment on Count I of the Complaint; Plaintiff seeks summary judgment on the S&F Defendant's counterclaims; and the S&F Defendants move for summary judgment Counts II and III of the Complaint as well as the Wilson Defendants' misrepresentation and intentional interference cross claims, and seek to dismiss defendants Francis and Hagen in their individual capacities.

## I. Plaintiff's Motion for Summary Judgment

### A. Plaintiff's Count I - Declaratory Relief on Ownership of Screenplay

The Act encompasses a body of law that deals with the ownership, publication, distribution, and presentation of original works of literature, music, and art. Under the Act, "[c]opyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work." 17 U.S.C. § 201(a) (2007). In the absence of an agreement to the contrary, original works created by an employee as part of their regular duties for the benefit of their employer are owned by the employer, who is also considered the author of the work. 17 U.S.C. § 201(b) (2007). Additionally, ownership of copyrighted material, or any exclusive

---

[12]The S&F Defendants also assert a cross-claim for infringement based on the Wilson Defendants' rewrite of the Screenplay and attempts to market the rewrite. This cross-claim is not currently at issue.

right comprised in a copyright, may be conveyed by the owner to a third party. 17 U.S.C. § 201(d) (2007).

Here, there is no dispute that Kesey is the author[13] of the Screenplay and that Smith assisted in writing at least the first draft. However, the S&F Defendants argue that the Screenplay was written by Kesey and Smith as a work made for hire and that, as a result, S&F is the author and owner of the Screenplay. Alternatively, the S&F Defendants argue that the Letter was a transfer of all rights in and to the Screenplay from Kesey to S&F.

### 1. Work Made for Hire

Under the Act, an original work qualifies as a "work made for hire" in two scenarios: 1) the work is "prepared by an employee within the scope of his or her employment;" or 2) the work falls within one of nine categories, is "specially ordered or commissioned", and "the parties agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101 (2007). The S&F Defendants contend that the Screenplay is a work made for hire under both scenarios.

### a. Kesey and Smith as "Employees" of S&F

The United States Supreme Court has clearly directed all courts to apply general common law agency principles in determining whether a work is prepared by an employee within the scope of his or her employment. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740-41 (1989). Generally, the court must "consider the hiring party's right to control the manner and means by which the product is accomplished." *Id.* at 751. Factors relevant to this inquiry are:

---

[13]The S&F Defendants argue that they are coauthors of the Screenplay as a result of their contribution of background information. This argument is addressed, infra.

the skill required; the sources of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751-52 (citing Restatement (Second) of Agency § 220(2) (1958)). The court must view the factors as a whole – no one factor is determinative. *Id.* at 752.

In *Reid*, a case substantially similar to that currently before the court, the Supreme Court found that the artist, not the organization who commissioned the work, was the creator and owner of a sculpture. *Reid* involved an oral agreement between an organization and Reid for the production of a statute dramatizing the plight of the homeless in Washington, D.C., at a price of $15,000. The organization conceived the title, idea, and general appearance of the statute – a life-sized statue of a homeless black family consisting of two adults and an infant reclining on a steam grate to keep warm. The organization agreed to provide the steam grate, which was to be on a pedestal containing concealed special effects equipment emitting simulated steam. The organization also decided what material would be used, and rejected Reid's idea to use suitcases or shopping bags to hold the family's belongings, insisting that a shopping cart be used. *Reid*, 490 U.S. at 733-34. Reid was a skilled artist retained for a specific project which lasted a relatively short period of time. He worked out of his studio, supplied his own tools, hired and paid his assistants, and received full payment upon completion of the sculpture. *Id.* at 752-53. While organization members directed Reid's work from Washington, D.C., and visited him on occasion to check on the progress and coordinate the building of the pedestal, the organization did not have the right to assign additional projects to Reid, did not control when and how Reid worked on the sculpture, did not pay payroll taxes or provide

{SIB}

other employee benefits to Reid, and was not in the business of creating sculptures. *Id.* at 753. Based on these factors, the Court held that Reid was not an employee of the organization, but rather an independent contractor. *Id.*

The facts to be considered by the court in determining whether Kesey and Smith were independent contractors or employees of S&F are not in dispute. Kesey, and Smith to some degree, were skilled in the art of writing. The Screenplay was written at Kesey's residence on his typewriter and on his schedule. Kesey's writing relationship with S&F lasted less than a year and Smith's lasted a month. Hagen and Francis provided factual information and photographs to Kesey, but Kesey and Smith developed the plot, sequence of events, characters, mood, tone, setting, and pace, and even the title for the Screenplay. Kesey and Smith were paid at the start of the project and Kesey received the second payment upon completion of the Screenplay. No taxes were withheld from the payments and Kesey and Smith were not provided employee benefits of any kind. Kesey selected Smith as his assistant and negotiated for the $3,000 paid to Smith by S&F. S&F was not in the regular business of writing or producing screenplays and was not even incorporated until May 1984, more than four months after Kesey started work on the Screenplay. While Kesey joined Francis and Hagen on trips and assisted in marketing the Screenplay after it was completed, there is no evidence that S&F had the authority to demand that Kesey participate in such activities or to assign any additional projects to Kesey.

Viewing the evidence as whole and considering all of the relevant factors, the court finds that no reasonable trier of fact could determine that Kesey and Smith were employees of S&F. The Screenplay was not a work made for hire and S&F is not the author or the owner of the Screenplay as the employer of Kesey and Smith.

b. Specially Commissioned Work

Once a court determines that the author of an original work is an independent contractor rather than an employee, it must consider whether the work was one of the nine enumerated in the statute, was specially ordered or commissioned, and was subject to an express agreement characterizing the Screenplay as a work made for hire. The parties appear to agree that the Screenplay is a "part of a motion picture or other audiovisual work" and is one of the nine enumerated works covered by the statute. The questions remaining are whether the Screenplay was "specially ordered or commissioned" by S&F and whether the Letter was an express agreement that the Screenplay would be considered a work made for hire.

i. Specially Ordered or Commissioned

In determining whether a work is specially ordered or commissioned, the primary factor seems to be whether the works were made at the "instance" of the requesting party, or, in other words, whether the request for the work was the "motivating factor" in the creation of the work. *Playboy Enterprises, Inc., v. Dumas*, 53 F.3d 549, 563 (2nd Cir. 1995). The court in *Playboy* also referenced an "expense" test, which is met when an independent contractor is paid a sum certain for his or her work, but noted that the form of compensation was not outcome determinative. *Id.* at 549, 555 (citing *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir.), *cert. denied*, 409 U.S. 9997 (1972)("the absence of a fixed salary . . . is never conclusive)).

The evidence establishes that while Kesey had considered writing about the Pendleton Round-Up for years, Francis and Hagen's request prompted Kesey to put aside "Sailor Song", another project that he had been working on, to write the Screenplay. Additionally, S&F paid Kesey and Smith a sum certain to write the Screenplay, which, while not outcome determinative, meets the

expense portion of the test. Thus, the court finds that this evidence establishes that Francis and Hagen were the motivating factor in Kesey and Smith's work on the Screenplay.

### ii. Express Agreement

Under the Act, a work will be considered a specially commissioned work made for hire only when the "parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101 (2007). In determining whether an agreement meets these requirements, the court must determine whether: 1) the parties intended, at the time the work was created, that it would be a work made for hire; 2) the language of the agreement is sufficient to meet the requirement of the statute; and 3) the agreement was signed by both parties or their authorized agents. *Playboy*, 53 F.3d 559.[14]

### aa. Parties' Intent

The only evidence which supports a finding that the parties intended the Screenplay to be created as a work made for hire is Francis's deposition testimony. While Francis represents that she understood and intended the Screenplay would be written on behalf of S&F by Kesey and Smith as a work made for hire, her testimony regarding her discussions with Hagen and Kesey in December 1983 and January 1984 is vague at best and does not establish that she ever shared this intent with Kesey. Furthermore, Smith and Hagen's testimony, as well as Francis's subsequent conduct, makes it clear that Francis was alone in this way of thinking. Smith understood that the parties would negotiate the sale of the rights to the Screenplay after it was completed and Hagen described the initial discussions and payments as a "kick start" to get the process going. Upon completion of the

---

[14]The court in *Playboy* also discussed the need for the agreement to be signed contemporaneously with the creation of the work. Because the Letter was signed before the Screenplay was completed, the court need not address this issue.

Screenplay, Francis began corresponding with Kesey and his representatives in an attempt to acquire the copyrights to the Screenplay which directly contradicts Francis's deposition testimony that she thought the payments made to Kesey were for Kesey to write the Screenplay for S&F and that S&F would own all rights to the Screenplay. The court finds that it was not the intent of the parties before the creation of the work that Kesey and Smith would write the Screenplay as a commissioned work made for hire.

### bb. Sufficiency of the Writing

In *Playboy*, the court declared that a writing must mention a work-for-hire relationship to qualify as an agreement under the statute. *Id.* at 560. The court then held that a legend stamped on the back of a check issued as payment for a work which read, in part:

> By endorsement of this check, payee acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title and interest in and to the following items: [a description of a work followed].

did not satisfy the statutory writing requirement while a legend that read, in part:

> BY ENDORSEMENT, PAYEE: acknowledges payment in full for services rendered on a work-made-for-hire basis in connection with the Work named on the face of this check and confirms ownership by Playboy Enterprises, Inc. of all right, title and interest (except physical possession), including all rights of copyright, and to the Work.

met the statutory requirement in that it confirmed that the services were rendered on a work-for-hire basis. *Id.*

In *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140-41 (9th Cir. 2003), the Ninth Circuit similarly found that agreements which stated that the commissioning party contracted to employ the artist to render services, that the commissioning party would own all right, title and interest in and to the artist's works to the same extent as if the artist was employed by the

commissioning party, and that the commissioning party, as the artists employer for hire, would be deemed the author of the created works, were sufficient under the Act. The court explained "that the agreements did not use the talismanic words 'specially ordered or commissioned' matter not, for there is no requirement, either in the Act or the caselaw, that work-for-hire contracts include any specific wording." *Id.* at 1141. It then held that the contracts which internally designated the created works as "works made for hire" and provided that the commissioning party would be "deemed the author thereof for all purposes" were consistent with a work-for-hire relationship under the Act. *Id.* at 1142.

While the general consensus is that the Act does not require specific words to express that a work is being created as a work made for hire, it is clear that the Act requires something more than the language found in the Letter. The Letter does not mention that Kesey was acting as an employee of S&F in writing the Screenplay or that the Screenplay was to be created as a work made for hire. Additionally, the Letter is silent with regard to who would own the rights to the Screenplay once it was completed. The language in the Letter indicating that Kesey was writing "for" S&F, standing alone, is not sufficient to establish an express agreement between Kesey and S&F that the Screenplay was created as a work made for hire under the Act.

### cc. Signed by the Parties

The Act requires that the written instrument memorializing the parties' intent that the work be considered a work made for hire be "signed by them." 17 U.S.C. § 101 (2007). Federal courts have consistently construed this language to require the execution of the agreement by "by both parties or their authorized agents." *Playboy*, 53 F.3d 559. See also *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412 (7th Cir. 1992)("The statutory language is 'signed by them,' 17

U.S.C. § 101(2), that is, by both parties, and it means what it says.")(*citing* 1 Paul Goldstein, *Copyright: Principles, Law and Practice* § 4.3.2.2. at P. 504 and n. 54 (1989)).

Kesey drafted and signed the Letter. It is not signed by Smith, Kesey's coauthor, or by Hagen or Francis, in either their individual capacities or as the authorized representative of S&F, which was not even in existence at the time the Letter was drafted.

The court finds that the evidence establishes that the parties did not intend for the Screenplay to be created as a work made for hire at the time it was created. The Letter did not indicate that the Screenplay was to be written as a work made for hire, was silent on who would own the rights to the Screenplay upon its completion, and was not signed by the parties or their authorized representatives. Accordingly, the Screenplay was not a specially commissioned work made for hire under the Act.

### 2. Transfer of Copyright by Agreement

The S&F Defendants also assert that the Letter qualifies as an instrument of conveyance which effectively transferred all rights in the Screenplay to S&F under the Act. Section 204(a) provides that:

> A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

17 U.S.C. § 204(a) (2007). Section 204(a) "ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price. *Effects Associates v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990).

Like the agreement memorializing a work made for hire, the agreement under § 204 need not

contain particular language to be effective. *Radio Television Espanola, S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999)("No magic words must be included in a document to satisfy § 204(a).") "Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright," *Id.*, "should also serve as a guidepost for the parties to resolve their disputes," *Konigsberg Intl. Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994), and contain "some language of finality." *Lyrick Studios, Inc. v. Big Idea Productions, Inc.*, 420 F.3d 388, 392-93 (5th Cir. 2005). Any ambiguity in the instrument of conveyance or memorandum of transfer "must be interpreted in favor of the original copyright holder to satisfy the purpose of Section 204(a)." *Bieg v. Hovnanian Enterprises, Inc.*, 157 F.Supp.2d 475 (E.D. Pa. 2001)(relying on the Ninth Circuit's reasoning in *Effects*).

In *Playboy*, the Second Circuit affirmed the opinion of the district court that a legend on the back of a check which stated that:

> By endorsement of this check, payee acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title and interest in and to the following items: [a description of a work followed].

was not indicative of an understanding between the parties and was insufficient to meet the writing requirement of § 204(a). *Playboy*, 53 F.3d at 564. In doing so, the court specifically noted that the legend did not mention copyright. *Id.* Similarly, the Ninth Circuit held that a fax referencing an alleged understanding regarding a license agreement for the broadcast rights of two animated television programs and discussing some of the details of the agreement did not satisfy § 204(a):

> Surely, the fax references a deal, but it does not specify anything about that deal or whether that deal is for an exclusive license for the program or for other broadcast rights. A mere reference to a deal without any information about the deal itself fails to satisfy the simple requirements of § 204(a). Without more, the comment in the Garcia fax is merely a part of negotiations rather than an "instrument of conveyance"

or "memorandum of the transfer."

*Radio*, 183 F.3d at 927. Additionally, the Ninth Circuit noted that a statement by one party that it was waiting for the contracts implied that the agreement was not yet final. *Id.* at 928. See also *Lyrick*, 420 F.3d at 393 (Statements in faxes that "Of course, for both of our protection, no contract will exist until both parties have executed a formal agreement," and "We agree to proceed to formalize this relationship as quickly as possible with binding agreements," indicated that the faxes were not a binding agreement and did not satisfy § 204(a).).

The Letter does not mention copyrights, licenses, or an agreement. It does not indicate what rights in the Screenplay, if any, were to be transferred to S&F or what compensation Kesey was to receive in exchange for the transfer of such rights. The Letter is silent with regard to how the parties would resolve any disputes arising from the transfer of the Screenplay rights and does not contain any indication that the Letter was to be the final agreement between the parties with regard to the Screenplay. To the contrary, the fact that S&F engaged in various attempts to purchase exclusive licensing rights to the Screenplay from Kesey after he signed the Letter is clear evidence that the Letter was not the final agreement between the parties with regard to the copyrights in the Screenplay. Finally, the Letter was not signed by Smith, a co-author of the Screenplay, and would have no effect on his rights in and to the Screenplay. The Letter is not an unambiguous instrument of conveyance or memorandum of transfer under § 204(a).

### 3. S&F as Joint Author

The S&F Defendants assert that they are joint authors of the Screenplay by virtue of Francis's contribution of factual background. As noted in the court's opinion on the evidentiary issues, the Act defines a "joint work" as "a work prepared by two or more authors with the intention that their

contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101 (2007). The Ninth Circuit has held that "joint authorship requires each author to make an independently copyrightable contribution." *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990). Only original works of authorship are entitled to copyright protection. 17 U.S.C. § 102(a) (2007). "No author may copyright facts or ideas." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547 (1985). Francis's contribution of factual information about the 1911 Pendleton Round-Up is not entitled to copyright protection and does not make her, or S&F, a joint author of the Screenplay.

4. Effect of Copyright Registration

The S&F Defendants claim an ownership interest in the Screenplay by virtue of the copyright registration filed in March 1994 listing S&F as the copyright claimant and author of the entire text. The S&F Defendants argue that this registration is *prima facie* evidence of their ownership of all rights in and to the Screenplay. The Act provides that:

> [i]n any judicial proceedings the certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.

17 U.S.C. §410(c). The Ninth Circuit has held that this provision creates a rebuttable presumption of copyright ownership and shifts the burden to the opposing party to present evidence to show why the copyright is not valid. *Bibbero Sys., Inc. v. Colwell Sys., Inc.*, 893 F.2d 1104, 1106 (9th Cir. 1990). *See also Aalmuhammed v. Lee*, 202 F.3d 1227, 1236 (9th Cir. 1999)("The presumptive validity of the certificate may be rebutted and defeated on summary judgment.")(*quoting S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1086 (9th Cir. 1989)).

The certificate of copyright, which was signed on March 21, 1994, by Francis, as the

authorized agent of S&F, indicates that the Screenplay was created as a work made for hire and that S&F is the author and owner of the entire Screenplay. This court has determined that the Screenplay was not a work made for hire and that S&F is neither the author nor owner of the Screenplay. Plaintiff has met its burden to produce evidence proving that the copyright registration is not valid. Accordingly, the fact that the registration was filed is not evidence of S&F's ownership of the copyrights to the Screenplay.

### 5. Derivative Work

The S&F Defendants appear to argue that Smith's interest as co-author in the Screenplay is limited to the first draft delivered to Francis in mid-1984. Smith was not actively involved in the preparation of the final draft delivered to S&F in September 1984 and, therefore, according to the S&F Defendants, has no ownership interest in the version of the Screenplay currently before the court. The Act provides that the owner of a copyright has the exclusive rights to "prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2) (2007). A work containing editorial revisions, elaborations, or other modifications to a preexisting work is considered a derivative work. 17 U.S.C. § 101 (2007).

The S&F Defendants concede that Smith was a co-author of the first draft of the Screenplay. The court has determined that the Screenplay was not a work made for hire. Consequently, Smith is a co-owner of the first draft of the Screenplay. Virtually all of the essential elements of the Screenplay, including the plot, sequence of events, characters, mood, tone, setting, and pace, were in place by the time Smith stopped working on the project. This fact is admitted by Francis who testified that the second draft of the Screenplay "wasn't changed very much from the first draft." (Francis Depo. Vol. II 114:7-11.)

The Screenplay consists of the first draft plus Kesey's editorial revisions, elaborations, and modifications. Accordingly, the Screenplay qualifies as a derivative work of the first draft of the Screenplay. Smith's status as co-author and co-owner of the first draft of the Screenplay extends to the current version of the Screenplay. Additionally, the Brochure, which was distributed by S&F in September 1984, identified the Screenplay as a "Screenplay in progress by Ken Kesey and Irby Smith" which supports a finding that Smith is a co-author and co-owner of the Screenplay.

Kesey and Smith are the joint authors of the Screenplay. They did not transfer their rights to anyone and remained the exclusive co-owners of the Screenplay until their respective rights were transferred to Plaintiff. S&F holds no authorship or ownership rights to the Screenplay and the S&F Defendants' request for a declaration that they are the copyright owners should be denied.

6. Defenses to Copyright Ownership

The S&F Defendants argue that even if Plaintiff is the owner of all rights in and to the Screenplay by virtue of the assignments of the interests of Kesey and Smith, the original authors and owners, the court must deny Plaintiff's request for declaratory relief based on the following defenses: 1) Plaintiff failed to file this action within three years of the date S&F first asserted an ownership interest in the copyrights to the Screenplay and is, therefore, barred by the applicable statute of limitations; 2) Plaintiff's delay from 1984 to 2006 in asserting an ownership interest in the copyrights to the Screenplay was unreasonable and Plaintiff's claim is barred by the doctrine of laches; 3) Kesey assisted the S&F Defendants in marketing the Screenplay and, consequently, Plaintiff is estopped from claiming an ownership interest in the Screenplay; and 4) S&F obtained a nonexclusive copyright license to produce the Screenplay.

a. Statute of Limitations

The Act provides that "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). A cause of action for ownership of a work is based on the creation of the work and accrues when a "plain and express repudiation" of ownership is communicated to the claimant. *Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir. 1996), *cert. denied*, 519 U.S. 1090 (1997). The cases establish that the Ninth Circuit requires a direct, unequivocal claim of ownership to put the claimant on notice and start the running of the statute of limitations. In *Zuill*, two claimants filed an action in October of 1991 asserting ownership interests in music they wrote for use in the Hooked on Phonics product. *Id.* The defendant presented evidence that he had repeatedly claimed sole ownership in the copyright to the product by furnishing copies of the product bearing a printed copyright notice in August 1986 to third parties and by identifying himself as "sole owner and copyright holder" in an agreement presented to the claimants in January of 1987 in which he offered to pay claimants a percentage of the profits from the product as payment for their services. The Ninth Circuit found that the defendant's "plain and express repudiation in 1986 and 1987 of any claim to co-ownership caused [claimant's] action, if any, to accrue and so the district court properly found the action to be barred by the statute of limitations." *Id.* at 1371.

On the other hand, the Ninth Circuit found that evidence that a claimant had written notice in 1991 that a movie was being exploited by the release of a home video version did not bar her from pursuing her ownership claim in the movie in 2003. *Welles v. Turner Entm't Co.*, 503 F.3d 728 (9th Cir. 2007). The court explained that while the written notice:

> might have informed Beatrice Welles that the defendants were distributing *Citizen Kane* on home video, it is not the plain and express repudiation of copyright ownership that our case law requires for the statue of limitation on a copyright

ownership claim to begin running.

*Id.* at 734. Similarly, the refusal of plaintiff's request for a writing credit as co-writer of the movie *Malcolm X* in conjunction with an executive producer's statement that they would "discuss it further at some point" left the question of ownership open for further discussion and raised a genuine issue of fact on whether the ownership claim was barred by the statute of limitations. *Aalmuhammed*, 202 F.3d at 1231. In *Aalmuhammed*, the court noted that when plaintiff applied for a copyright in the movie, the Copyright Office "issued him a 'Certificate of Registration,' but advised him in a letter that his 'claims conflict with previous registrations' of the film." *Id.* at 1230. While the Ninth Circuit did not address the effect of the previous registrations on the accrual of the statute of limitations in *Aalmuhammed*, the Seventh Circuit has clearly held that the mere act of registering a copyright is not sufficient evidence of a claim of ownership to trigger the statute of limitations, noting that "[a]uthors don't consult the records of the Copyright Office to see whether someone has asserted copyright in their works." *Gaiman v. McFarlane*, 360 F.3d 644, 655 (7th Cir. 2004).

Plaintiff filed this action on April 21, 2006. Accordingly, if the S&F Defendants are able to establish that Plaintiff had knowledge of a plain and express repudiation by S&F of its copyright ownership of the Screenplay prior to April 22, 2003, Plaintiff's request for an order that it is the sole and exclusive owner of a rights in and to the Screenplay and Novel is barred by the three-year statute of limitations. The S&F Defendants argue that Plaintiff had adequate notice of S&F's ownership claim in 1984, when the Letter was signed and the Screenplay completed; in 1990, when S&F optioned its interest in the Screenplay to Associates; in 1994, when Associates exchanged correspondence with Kesey and filed a copyright registration on the Screenplay on behalf of S&F; and in February 2002, when Kesey-Smith first had knowledge of the 1994 copyright registration filed

by Associates.

### i. 1984

The evidence is clear that as of 1984, Kesey, Smith, Faye, Hagen, and to some extent, Francis, all acknowledged that Kesey was an author and owner of the Screenplay. The fact that Francis listed Kesey, not S&F, as the owner of the Screenplay in the proposed licensing agreements prepared in 1985 is further evidence of this understanding. S&F did not unequivocally claim ownership rights in the Screenplay in 1984. To the contrary, the S&F Defendants acknowledged in 1985 that Kesey owned rights in the Screenplay.

### ii. 1990

In 1990, S&F sold its rights, if any existed, in the Screenplay to Associates. In the agreements, S&F represented that it was the sole owner of all rights in the literary material entitled "Last Go Round." While this may qualify as an unequivocal claim to ownership of the Screenplay by S&F, there is no evidence that Kesey or Smith were provided with copies of the agreement or were otherwise aware that S&F was claiming that it owned the Screenplay. Additionally, just four months after Associates purchased S&F's rights to the Screenplay, Associates negotiated with Kesey for the purchase of the same Property and prepared an agreement identifying Kesey as the owner of all rights to the Screenplay as well as the unwritten Novel. This acknowledgment that Kesey owned rights to the Screenplay in late 1990 was clearly not a plain and express repudiation of Kesey's ownership and negates any unequivocal claim of ownership by S&F or Associates in August 1990.

### iii. 1994

In early 1994, the upcoming publication of the Novel, and rumors that the Wilson Defendants were claiming ownership of the Screenplay and planning to block the publication, prompted Kesey's

attorney to contact Wilson. During that conversation, Wilson claimed to own only motion picture rights to the Screenplay and explained that she was planning to produce a film version of the project. In a letter to Skrzyniarz, legal counsel for the Wilson Defendants, Rose refuted Wilson's claims, stated that Kesey owned all rights to the Screenplay, demanded that Wilson cease and desist from holding herself out as producer and owner of the Screenplay, and threatened to initiate litigation to protect Kesey's rights in the Screenplay if it became necessary. The Wilson Defendants responded by quietly registering a copyright in the Screenplay listing S&F as both the copyright claimant and author. Then, in a letter dated May 6, 1994, the Wilson Defendants offered to release publication rights in the Novel to Kesey in exchange for Kesey waiving all of his other rights in Novel and the Screenplay. The attorneys exchanged letters asserting their respective clients' ownership of the writings. On May 17, 1994, Skryzniarz requested that Kesey delay publication of the Novel until the issue was resolved and advised that failure to do so would result in harm to the Wilson Defendants and prompt legal action. Rose denied the request and the Novel was published and received favorable press. In response, the Wilson Defendants took no steps to protect their asserted ownership rights in the Screenplay and Novel.

First, there is no evidence that Plaintiff, or its predecessors, had knowledge of the copyright registration in 1994. Second, by offering to negotiate for the wavier of Kesey's rights in the Screenplay and Novel and asking for additional time to resolve the issue, the Wilson Defendants acknowledged that Kesey owned, or potentially owned, some rights in both works. Third, the Wilson Defendants' failure to initiate legal proceedings, or take other action, to protect their interest in the Screenplay and Novel after the Novel was published is not the conduct expected of a copyright owner faced with imminent or actual acts of copyright infringement. It is more akin to the conduct

of an opponent whose bluff has been called. Finally, at no time did the S&F Defendants assert a claim of ownership of the Screenplay and Novel as a result of Kesey's assertion of ownership rights to the Screenplay and Novel or the publication of the Novel. In fact, Francis admitted to knowing that the Novel was published and that it infringed on the Screenplay, but felt that the publicity surrounding the release and the popularity of the Novel would benefit the subsequent production and release of a movie based on the Screenplay.

The conduct of both the Wilson Defendants and the S&F Defendants in 1994 is not the plain and express repudiation of Kesey's claim to the Screenplay and Novel required by the Ninth Circuit to trigger the running of the three-year statute of limitations. To the contrary, Kesey was the one who asserted unequivocal ownership rights in and to the Screenplay and Novel and consistently acted in accordance with those rights.

### iv. 2002

In February 2002, legal counsel for a party interested in the Screenplay advised Sterling Lord by letter that S&F claimed to own the Screenplay as a work made for hire in a copyright registration filed with the United States Patent Office. Kesey-Smith admitted that she was made aware of the copyright registration at that time. There is no evidence that Kesey-Smith shared this information with anyone else.

In February 2002, at the time Kesey-Smith first became aware of S&F's claim of ownership in the copyright registration, Kesey's assets, including his interest in the Screenplay, were part of his estate. In Oregon, only the personal representative of a decedent's estate has the authority to initiate legal action on behalf of the estate for wrongs suffered by the decedent before his death and to protect the assets of the estate. OR. REV. STAT. 114.305(18) and (19) (2007). Faye, who was acting

as the personal representative of Kesey's estate, was not aware of the claim of ownership during the pendency of the probate proceedings. Therefore, the ownership claim did not accrue during this period.

The literary assets of the estate, including all of Kesey's rights to the Screenplay, were transferred to Plaintiff by a document effective as of March 10, 2003, but, according to the notary, signed by Faye on May 14, 2003. The Operating Agreement establishing Plaintiff, which was signed by the beneficiaries of Kesey's estate in March 2003, designated Faye as the registered agent and manager of Plaintiff. Faye held 72.64 percent of the ownership interest and voting rights while the remaining beneficiaries, including Kesey-Smith, each held 6.84 percent of the ownership interest and voting rights and were designated as members.

The S&F Defendants assert in their Concise Statement of Material Facts filed on June 16, 2008, that "Shannon Kesey is the manager of Plaintiff LLC." (S&F Defs.' Concise Statement of Material Facts, ¶ 26.) Even assuming that Kesey-Smith was the manager of Plaintiff as of June, 2008, there is no evidence establishing when Kesey-Smith assumed the obligations of manager. There is evidence that Faye was the manager of Plaintiff as late as May 14, 2003, based on the notary acknowledgment indicating that Faye signed the transfer of copyrights "in her capacities as Manager of the Kesey, L.L.C., and as Personal Representative of the Estate of Ken Kesey" on May 14, 2003. (Aronoff Decl. Exh. O.)

The Oregon courts have acknowledged that:

> [a] potential corporate plaintiff is not a sentient being and, therefore, cannot "know," be aware of, or discover anything, except through the agency of its officers, directors, and employees. A corporation generally is charged with knowledge of facts that its agents learn within the scope of their employment.

{SIB}

*Fed. Deposit Ins. Corp. v. Smith*, 328 Or. 420, 429 (1999). As a "member-managed limited liability company," only Faye was an agent of the company for the purposes of its business. OR. REV. STAT. 63.140(2)(a) (2007). Additionally, the agreement specifically provided that "no Member shall have the power to act as an agent of the company nor shall any Member have the power to bind the company or execute any instrument on behalf of the company." (Aranoff Decl. Exh. N at 4.) Consequently, Plaintiff is not charged with knowledge of S&F's ownership claims in the 1994 copyright registration until Faye learned of the existence of such document.

Faye testified that she first became aware that S&F filed a copyright registration in 2003 when she filed the transfer of rights. (Faye Depo. 33:23-34:7.) The copyright registration representing the transfer of rights from the Kesey estate to the Plaintiff was recorded by the United States Copyright Office on June 5, 2003. It is apparent from Faye's testimony and the documentation that Faye became was aware of S&F's copyright registration for the first time shortly before June 5, 2003.

Based on the evidence before the court, Plaintiff filed this action within three years of its agent first obtaining knowledge of S&F's unequivocal assertion of ownership rights in the Screenplay in the 1994 copyright registration. Thus, Plaintiff filed this action asserting Kesey's ownership interest in the Screenplay in a timely manner.

The S&F Defendants argue that Smith had adequate notice of S&F's unequivocal claim of ownership in the Screenplay by virtue of the conversation he had with Francis in 1995. In that conversation, Francis threatens legal action on behalf of the corporation if Kesey and Smith ever attempted to go forward with the Screenplay. In its evidentiary opinion, the court limited the admissibility of the conversation to the effect it had on Francis, who subsequently discarded records

based on Smith's expressed desire to avoid legal action. This evidence, admitted for this purpose, does not provide Smith with notice that S&F is asserting a unequivocal claim of ownership in the Screenplay. The court finds that Plaintiff filed this action asserting Smith's interest in the Screenplay in a timely manner as well.

### b. Laches

The S&F Defendants argue that Kesey's, and then Plaintiff's, failure to file an action to determine who owned the copyrights to the Screenplay between 1984 and 2006 was unreasonable and that, as a result, Plaintiff's request for declaratory relief is barred by the doctrine of laches. The Ninth Circuit has recognized that "[c]laims of ownership are traditionally subject to the defense of laches" and that laches may be a defense to an action seeking a declaration of authorship and resulting ownership of a copyrightable work. *Jackson v. Axton*, 25 F.3d 884, 887-89 (9th Cir. 1994). To establish the affirmative defense of laches, a defendant must present evidence that the plaintiff unreasonably delayed the filing of the action and that the defendant was prejudiced by the delay. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001). "[A]ny delay is to be measured from the time that plaintiff knew or should have known about the potential claim at issue." *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000). In extraordinary circumstances, laches may bar a claim that is within the applicable statute of limitations if the defendant is able to establish harm resulting from such delay. *Danjaq*, 263 F.3d at 954 (citing *Telink, Inc. v. United States*, 24 F.3d 42, 46 n. 5 (9th Cir. 1994).)

Plaintiff argues that the doctrine of laches is not triggered by merely knowing of the existence of an ownership dispute but, rather, requires infringement or an exploitation of the work at issue by the defendant. Plaintiff relies on *Kling*, in which the Ninth Circuit discussed the triggering event for

laches in the context of a copyright infringement suit. *Kling* involved a dispute between plaintiff, the widow of the author of a number of three Rainbow Brite and three Robotman television specials, the corporation for whom he was writing the specials pursuant to contracts signed in 1983 and 1984, and the entities to which the corporation assigned its copyright interests. The contract related only to syndication broadcasts of the specials, and provided that plaintiff's husband would receive credit as a writer and developer. Copyright registrations filed from 1984 to 1986 covering various works related to the Rainbow Brite characters, including those specials written by plaintiff's husband, listed the corporation as the author of the works and the assignee as the owner. Similarly, copyright registrations filed during the same period for the Robotman specials listed the assignee of the corporation's interest as the sole owner of the works. *Kling*, 225 F.3d 1032.

Beginning in 1984, plaintiff's husband complained that he was entitled to credit as the developer of featured characters appearing in specials not authored by him and raised issues about the ownership of the characters. A letter dated July 17, 1985, raised the issue of whether the television specials were created as a work made for hire. At that time, the corporation claimed that it was the rightful owner of the television specials. The parties eventually settled the credit dispute but did not resolve the issue of copyright ownership. *Id.* at 1033-34.

In August 1994, plaintiff discovered that the assignees had released her husband's Rainbow Brite and Robotman specials on videocassettes without the consent of either herself or her husband. In August 1997, she filed an action against the corporation and its assignees for copyright co-ownership and copyright infringement. *Id.* at 1034.

Defendants moved for summary judgment. Plaintiff conceded that her co-ownership claims were barred by the three-year statute of limitations and the district court entered summary judgment

on those claims. The district court then found that the copyright infringement claim was: 1) limited to the extent plaintiff could prove sole ownership of the copyrights based on the fact that a co-owner has the right to exploit the work; and 2) not barred by the statute of limitations because plaintiff did not know of the alleged infringement prior to August 30, 1994. *Id.* Plaintiff amended the complaint to allege that defendants had infringed her copyrights by exceeding the scope of the license granted them under the contract. Defendants again moved for summary judgment asserting that plaintiff's claim was barred by laches. The district court granted summary judgment finding the laches period for plaintiff's infringement claim began to run once plaintiff, or her predecessor, who were not obvious owners of the copyright, knew or had reason to know that defendants were claiming sole ownership of the copyrights to the television specials, or, in other words, when plaintiff's claim for a declaration of ownership accrued. *Id.* at 1035.

The Ninth Circuit reversed, finding that the district court's ruling was unworkable and inconsistent with the general rule for laches. The court noted that a claim for copyright infringement requires proof of both copyright ownership and the improper use of protected elements of the copyrighted work, and explained that:

> [t]he district court's rule triggers the laches period for an infringement claim at the time a plaintiff knows or should know about a dispute as to only the first of these two elements, ownership – regardless or whether any actual or impending infringement claim exists at the time. The rule is not equitable: it allows for the defeat of a legal claim even though the plaintiff has not delayed in asserting his rights with regard to that claim, and in fact the claim has not yet arisen.

*Id.* at 1037-38. The Ninth Circuit then held that "knowledge of contested ownership without more is insufficient to run the laches period for future infringement claims, because such knowledge relates to only one of the two elements of the copyright infringement actions." *Id.* at 1039.

The Ninth Circuit also questioned the district court's reliance on *Jackson*, which established that, in an action seeking a declaration of ownership, the laches period begins when the plaintiff learns of a competing claim of exclusive ownership. The court noted that in *Jackson*, it was addressing an ownership action, not an infringement action, and stated that Jackson "was certainly not intended to set a rule, by negative implication, for the wholly different context of copyright infringement suits. Indeed, we expressly stated the case did not involve the application of laches to an infringement claim." *Id.* at 1037.

Following the lead of the Ninth Circuit, this court finds that the rule enunciated in *Kling*, a case involving claims of copyright infringement, is not applicable to the case currently before it, which involves a claim for copyright ownership. Instead, the court will apply the rule created in *Jackson* expressly for actions involving copyright ownership – that the laches period begins when a plaintiff learns of a competing claim of ownership to the copyrightable work. *Jackson*, 25 F.3d at 889 (songwriter's refusal to buy alleged cowriter's interest in the song and statement that the cowriter had nothing to do with writing the song were claims of sole ownership and sufficient to start the running of the laches period for a copyright ownership claim).

With this in mind, the analysis relevant to the triggering of the statute of limitations set forth above is, at least in part, applicable to determinating the length of delay with regard to the laches defense. The S&F Defendants argue that Kesey was aware of their efforts to market the Screenplay from 1984 and after. However, the fact that Kesey knew the S&F Defendants were marketing the Screenplay to producers is not evidence that Kesey knew that the S&F Defendants were claiming to be the sole owners of the Screenplay. The S&F Defendants could have been marketing the Screenplay in the hopes of obtaining a license from Kesey, which they in fact attempted to do in

1985. There is no evidence that Plaintiff, or its predecessors, had actual knowledge that S&F claimed sole ownership of the Screenplay prior to June, 2003.

The question to be answered is when Kesey should have known that S&F was claiming sole ownership of the Screenplay. "[T]he law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (1893). More recently, this court has held that:

> [t]o prove that a plaintiff knew or should have known of the defendant's allegedly wrongful activity, the defendant must "make a showing that it would have been inconceivable that [the plaintiff] would have been unaware" of those activities.

*Adidas-America, Inc., v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1069 (D. Or. 2008)(*quoting Official Airline Guides, Inc., v. Churchfield Publications, Inc.*, 756 F.Supp. 1393, 1404 (D. Or. 1990)).

The alleged wrongful activity at issue is the S&F Defendants' unequivocal claim of ownership of the Screenplay. The S&F Defendants' attempts to market the Screenplay through 1994, viewed in light of the S&F Defendants' recognition of Kesey's ownership rights in 1985 in correspondence and proposed licensing agreements, and Associates's acknowledgment of the same in 1994, would not put a reasonable person on notice that S&F claimed sole ownership in the Screenplay. The filing of the copyright registration in 1994 was an unequivocal claim of ownership by S&F. However, it is not inconceivable that Kesey was unaware of the filing or of S&F's assertion of ownership at this time. In fact, Kesey filed his own copyright registration shortly thereafter and was not advised by either S&F, Associates or the United States Copyright Office that a prior

conflicting registration had been filed. Additionally, Kesey published and marketed the Novel, which the S&F Defendants concede infringed on the Screenplay, with no objection from either S&F or Associates. Based on this information, a man of ordinary intelligence in Kesey's position would not be put on notice that S&F was claiming sole and exclusive ownership of the Screenplay in 1995. Thereafter, nothing occurred to alter this belief until Kesey-Smith became aware of the copyright registration in February 2002.

Even assuming that Faye should have known about S&F's copyright registration in February 2002 when her daughter became of the filing, or that it is inconceivable that Kesey-Smith would not have shared this information with her mother during the pendency of the estate and the creation of Plaintiff, the court is not convinced that the laches period would be triggered by this information. Again, there is no dispute that the S&F Defendants' failed to object to the copyright registration and publication of the Novel after S&F filed its copyright registration in the Screenplay in 1994. The fact that S&F allowed Kesey to copyright the Novel, a clearly derivative and infringing work of the Screenplay, and to publically exploit the Novel by publishing and marketing it worldwide, could justify Faye's failure to file an action in 2002. S&F's assertion of exclusive ownership of the Screenplay by filing the registration, when considered in conjunction with its subsequent failure to object to Kesey's copyright registration and publication of the Novel, is not evidence of a plain and express repudiation of Kesey's claim of ownership of rights in the Screenplay. In this scenario, Faye would not have been aware of a plain and express repudiation by S&F of Kesey's ownership claim until late 2004, when S&F's legal counsel initiated correspondence with Faye's attorney, and thus would not have unreasonably delayed the filing of this action by filing when she did on behalf of the Plaintiff.

Therefore, viewing the evidence in the light most favorable to S&F, including the effect of S&F's conduct after the filing of its copyright registration, the laches period for Plaintiff's claim begins to run in February 2002, a little more than four years before the filing of this action. The issues now to be addressed are whether Plaintiff's failure to file this action for four years, from February 2002 to April 2006, was reasonable or justified and whether such delay resulted in prejudice or harm to the S&F Defendants.

Courts have found the existence of permissible delay where it was necessitated by the exhaustion of remedies, was used to evaluate and prepare a complex case, or provided the opportunity to determine the cost efficiency of pursuing litigation. *Danjaq*, 263 F.3d at 954 (citations omitted.) Delay is not excused when it is used to capitalize on the financial or personal commitment of the defendant. *Id.* Plaintiff does not argue, and the court does not find, that the delay from February 2002 to the filing of this action in April 2006 was justified by any of these factors.

However, the court is also unable to find on this record that the S&F Defendants were prejudiced or harmed in any way by Plaintiff's failure to file this action for four years. Prejudice sufficient to support a laches defense may exist in two forms: 1) evidentiary-based prejudice resulting from the loss of fresh witnesses and evidence; and 2) expectations-based, or economic-based, prejudice resulting from actions defendant would not have taken or costs defendant would not have incurred had plaintiff initiated legal action in a timely manner. *Id.* at 955. The S&F Defendants contend that they suffered both forms of prejudice.

The S&F Defendants' alleged evidentiary-based prejudice derives from the death of Kesey, the author of the Screenplay; the death of Sydnie Gilbert, an individual to whom the S&F Defendants

were marketing the Screenplay; and the destruction by Francis of research materials, photographs, corporate documents, financial records, and correspondence related to the marketing of the Screenplay by S&F. Kesey passed away in 2001 and Francis destroyed her documents in 1995, both before Kesey-Smith had any knowledge that S&F claimed to own the Screenplay in the 1994 copyright registration in February 2002; thus, there is no connection between the loss of these sources of potential evidence and the delay that the S&F Defendants allege. There is very little evidence in the record about Sydnie Gilbert's involvement with the Screenplay. Francis described Gilbert as an individual who approached her about optioning the Screenplay during the time Kesey was cooperating and participating in meetings. (Francis Depo. Vol. I, 209:2-15.) Based on this evidence, it appears that Gilbert was involved in negotiations for the Screenplay in the mid-1980s, also well before the alleged period of delay upon which the S&F Defendants rely. Accordingly, none of the harm allegedly suffered by the S&F Defendants from the loss or destruction of evidence was the result of the four-year delay in filing this action.

The S&F Defendants also allege expectations-based prejudice based on their attempts to market the Screenplay from 1984. It is evident that the S&F Defendants marketed the Screenplay through the 1980s and then entered into a licensing agreement with Associates in 1990, which agreement extended through 1995. Thereafter, the record is unclear about when and to what extent the S&F Defendants marketed the Screenplay. Hagen mentions an entity called Shadowcatcher Entertainment which was tangentially involved with Wilson and expressed an interest in the Screenplay in 2004. (Hagen Depo. 176:1-13.) Francis states that Maginnis[15] and Fromkin, and a

---

[15]Maginnis is also spelled "McGinnis" in the briefing. In the interest of consistency, the court will refer to him only as Maginnis.

Mark Twogood, were having difficulties promoting the Screenplay because Wilson was shopping another script, but she does not indicate when this occurred. (Francis Depo. Vol. II. 23:2-11.) In their motion for summary judgment, the S&F Defendants indicate that Fromkin and Maginnis decided to take an option from the corporation in 2005. (Defs.' Motion for Summ. J. at 26.) Kesey-Smith testified that she was contacted by Fromkin on a referral from Wilson in 2003 or 2004 about making a movie from the Novel and that she put him in touch with Plaintiff's literary agent, Sterling Lord. (Kesey Smith Depo. 51:2-52:24.) On September 23, 2004, Fromkin expressed confusion over Wilson's involvement in the Screenplay/Novel and advised Kesey-Smith of the results of his copyright research.

This evidence establishes that the S&F Defendants were in contact with one, or maybe two, entities related to Wilson that were interested in the Screenplay, and that all of this contact may have occurred in 2004 or 2005, within the four-year laches period. However, there is no evidence that the S&F Defendants were actively marketing the Screenplay or investing any money in the Screenplay after 2002. In fact, it appears that the S&F Defendants had licensed the Screenplay to Fromkin and Maginnis either shortly before or during this period based on Francis's testimony that she received $30,000 from Fromkin and Maginnis and that Wilson was the party engaged in most of the promotion of the Screenplay during this period.

The court is not convinced that S&F plainly and expressly repudiated Kesey's ownership in the Screenplay in 1994 by registering a copyright in the Screenplay when viewed in light of S&F's subsequent failure to object to Kesey's registering and publication of the Novel, a derivative and infringing work, only a few months later. Accordingly, it is not clear that because Faye knew or should have known of S&F's copyright registration in February 2002, the time period for laches was

triggered at this time. However, even assuming that Faye knew or had reason to know of an unequivocal claim of ownership in the copyright registration by S&F as early as 2002, the court finds that there is no evidence that the S&F Defendants suffered any prejudice, either evidentiary or economic, as a result of the four-year delay. Additionally, there is no evidence that Smith ever knew or had reason to know of the copyright registration. The S&F Defendants' assertion of laches is not supported by the evidence and does not bar Plaintiff's claim of ownership of the Screenplay.

c. Estoppel

The S&F Defendants argue that Plaintiff is equitably estopped from asserting ownership rights in the Screenplay as a result of Kesey's allowing the world to believe that, and the S&F Defendants to act like, S&F owned the copyrights in the Screenplay. The S&F Defendants rely on Kesey's representations to numerous parties that S&F owned the Screenplay and his consent to S&F's optioning the Screenplay to Wilson in 1990 in support of this argument. While conceding that equitable estoppel has been applied by the federal courts in copyright infringement claims, Plaintiff argues that the writing requirements of § 101(2) and § 204(a) of the Act were designed to ensure predictability and certainty in copyright ownership and, as such, bar the application of estoppel to a claim for copyright ownership.

The S&F Defendants assert that "[e]stoppel has been recognized in copyright cases" and cite to *ITSI T.V. Productions, Inc. v. California Authority of Racing Fairs,* Nos. 93-16717, 93-16718 and 93-17167, 1995 WL 699824 (9th Cir. Nov. 27, 1995), an unpublished Ninth Circuit opinion, as authority for this proposition. The S&F Defendants reliance on this case is misplaced for two reasons. First, an unpublished opinion issued by the Ninth Circuit prior to January 1, 2007, is not of precedential value and should not be cited to the courts of the circuit. 9th Cir. R. 36-3. Second,

the court in *ITSI* was considering a claim for copyright infringement, not a claim of copyright ownership. The fact that the Ninth Circuit applied equitable estoppel to bar the plaintiff from denying its consent to an implied license in favor of the alleged infringer is not relevant to the material different question of whether the S&F Defendants can rely on equitable estoppel to prevent Plaintiff from asserting an ownership interest in the Screenplay.

The Ninth Circuit has expressly stated that any transfer of a copyright under § 204(a) requires a written document. *Lyrick*, 420 F.3d at 396. Additionally, a California district court has held that the equitable defenses, such as estoppel, should not be used to circumvent the writing requirement of § 204(a). *Pamfiloff v. Giant Records, Inc.*, 794 F. Supp. 933, 937 (N.D. Cal. 1992). The district explained that:

> Congress did not include within the terms of Section 204(a) any indication that equitable defenses such as estoppel which grew up around the common law statute of frauds should apply in the context of copyright transfer. This court is, therefore, hesitant to read such a provision into the terms of Section 204(a) and thereby undermine the goal of uniformity and predictability in the field of copyright ownership and transfer.

*Id.* This court is hesitant to read from these cases a rule that equitable estoppel will never be applied to a bar a claim of copyright ownership regardless of the argument or the section of the Act relied on by the plaintiff. The cases do not stand for this general proposition and specifically do not address the applicability of an estoppel defense to a claim made under § 101(2). However, because the evidence does not support the application of equitable estoppel to bar Plaintiff's ownership claim in this instance, the court finds that the S&F Defendants' assertion of the defense to this action is not supported by the record in any event.

In the context of a copyright claim, a party asserting estoppel must prove four elements:

1) the party to be estopped must know the facts; 2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; 3) the latter must be ignorant of the true facts; and 4) he must rely on the former's conduct to his injury.

*United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988). Plaintiff argues that the S&F Defendants can not establish the first element because there is no evidence that Plaintiff knew of infringing conduct by the S&F Defendants. The relevant facts in the context of a copyright ownership claim would be that the party to be estopped must know of a third party's conflicting claim of ownership not infringing conduct. The court has already found that neither Plaintiff, nor its successors, learned of the S&F Defendants claim of ownership to the Screenplay until June 2003.

With regard to the second element, the court agrees with Plaintiff that "Kesey and Smith engaged in no conduct that could have given the S&F Defendants the reasonable right to believe that S&F owned the copyright in the Screenplay." (Pl.'s Opp'n. Mem. in Resp. to S&F Mot. for Summ. J. at 19.) Kesey unequivocally asserted his ownership rights in the Screenplay from the beginning, as evidenced by the inclusion of the copyright designation on the copy of the final draft of the Screenplay offered by both parties in this action, as well as in the Brochure introducing the Screenplay to potential producers. In *Hampton v. Paramount Pictures, Corp.*, 279 F.2d 100, 104 (9th Cir. 1960), the Ninth Circuit found that Paramount's assertion of copyright ownership printed on the film at issue provided ample notice to third parties of Paramount's ownership interest in the film and negated any claim that Paramount's failure to subsequently complain about the Hampton's exhibition of the film estopped Paramount from asserting ownership of the film. Here, the inclusion of the copyright on both the Screenplay and the Brochure put on notice the S&F Defendants, as well as anyone offered a copy of either document, of Kesey's ownership interest in the Screenplay. More

to the point, there is no evidence that either Kesey or Smith ever represented to the S&F Defendants or anyone else that S&F owned the Screenplay or that either Kesey or Smith ever heard the S&F Defendants' assert an ownership interest in the Screenplay and failed to deny such assertion.

The record also makes clear that the S&F Defendants were not ignorant of the true facts – the evidence necessary to prove the third element. In addition to their knowledge of Kesey's assertion of an ownership interest on the Screenplay and the Brochure, Francis listed Kesey as the owner of the Screenplay in the draft licensing agreements prepared in late 1984 and acknowledged Kesey as owner of the Screenplay in correspondence during this same period. In the absence of evidence supporting the first three elements, the S&F Defendants are also unable to establish the fourth element; that they acted in reliance on Kesey's conduct to their injury.

Based on the evidence before the court, it is clear that there was no holding out or representations by Kesey and Smith regarding S&F's ownership of the Screenplay on which the S&F Defendants were entitled to rely. Plaintiff's claim is not barred by the doctrine of equitable estoppel.

### d. Implied License

Finally, the S&F Defendants argue that Plaintiff's claim of ownership must be denied because the S&F Defendants had a valid work-for-hire agreement supported, in part, by the *prima facie* presumption of validity of a copyright registration. In the alternative, the S&F Defendants argue that, at a minimum, the Letter granted them an implied license to market the Screenplay. The work made for hire and copyright registration arguments have been addressed and rejected. The implied license argument meets a similar fate.

The Ninth Circuit has recognized that a copyright owner may grant a nonexclusive license to a third party without complying with the strict writing requirements of the Act. *Foad Consulting*

*Group, Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 825 (9th Cir. 2001). The license may be granted orally or implied from the conduct of the parties. *Id.* at 826. In determining whether a nonexclusive copyright license has been granted, the federal courts look to state law, provided such law does not conflict with the Act. *Id.* at 827.

Plaintiff argues that the S&F Defendants waived its implied license argument by not asserting it as an affirmative defense in its answer. The claim of a license is an affirmative defense to a claim of copyright infringement that must be plead as a defense in a responsive pleading under FED. R. CIV. P. 8(c). *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000). Generally, the failure to assert an affirmative defense in an answer will serve as a waiver of that defense. *Arizona v. California*, 530 U.S. 392, 410 (2000); *Morrison v. Mahoney*, 399 F.3d. 1042, 1046 (9th Cir. 2005). However, the Ninth Circuit has held that, in the absence of prejudice to the plaintiff, a defendant may raise an affirmative defense for the first time at the summary judgment stage. *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993). Plaintiff has not asserted, and the evidence does not establish, that Plaintiff suffered any prejudice as a result of the S&F Defendants' failure to assert the defense in its answer. The court will consider the affirmative defense of an implied nonexclusive license.

The Ninth Circuit has recognized the existence of a license is an affirmative defense to a claim of copyright infringement. *Worldwide Church*, 227 F.3d at 1114. The affirmative defense allows a defendant to argue that, based on the conduct of the parties, the copyright owner has impliedly agreed to allow the defendant to use the copyrighted material for a specific purpose. *Effects* 908 F.3d at 558-59. A nonexclusive license is not an ownership interest and has no effect on the ownership of copyrighted material. *Michaels v. Internet Entm't Group, Inc.*, 5 F. Supp. 2d 823, 831

(C.D. Cal. 1998). To the contrary, the Ninth Circuit has characterized a nonexclusive patent license as "'mere waiver of the right to sue' the licensee for infringement." *In Re CFLC, Inc.*, 89 F.3d 673, 677 (9th Cir. 1996)(*quoting De Forest Radio Telephone & Telegraph Co. v. United States*, 273 U.S. 236, 242 (1927)).

Here, the court is addressing a claim for copyright ownership, not a claim for copyright infringement. Plaintiff concedes that the S&F Defendants have not engaged in any infringing acts to date. The fact that Kesey may have impliedly agreed to allow the S&F Defendants to market and/or produce the Screenplay has no bearing on the issue of who owns the copyrights to the Screenplay. Accordingly, the existence or absence of an implied nonexclusive license is not relevant to Plaintiff's claim of ownership and does not defeat its motion for summary judgment on that claim.

Moreover, the argument that the Letter and Kesey's conduct in early 1984 granted the S&F Defendants the right to market and/or produce the Screenplay is belied by the S&F Defendants' attempts to negotiate a license agreement after the Letter was signed and Francis's statement that they could not move forward without an agreement between Kesey and S&F. Both the federal courts and the Oregon state courts have held that the creation of a implied license or contractual obligation is premised on the intent of the parties or, in other words, a meeting of the minds. *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998)("Without intent, there can be no implied license."), *Vtech Communications, Inc. v. Robert Half, Inc.*, 190 Or. App. 81 (2003)(court refused to find creation of an enforceable oral agreement where there was no evidence of mutual assent, or meeting of the minds, on the essential terms of the alleged oral agreement.) The parties need to engage in further negotiation to obtain a license for the Screenplay, and Francis's statement that Kesey needed to agree to the terms of license before S&F could begin acting as a licensee of the Screenplay is evidence that

the parties did not intend for the Letter to create an enforceable license agreement. Along the same lines, if the Letter had granted the S&F Defendants an enforceable implied license to market and/or produce the Screenplay, the licensing agreement would have been redundant and superfluous.

Based on the evidence currently before it, the court is convinced that Kesey and Smith were the co-authors of the Screenplay, that they were not working as employees of S&F when writing the Screenplay, and that they did not transfer their ownership rights to S&F in a written document in the manner required by the Act. Plaintiff, as the successor in interest of both Kesey and Smith, is currently the sole owner of all of copyrights in and to the Screenplay. Plaintiff's request for a declaration that it is the sole owner of the Screenplay is not barred by the applicable statute of limitations, laches, estoppel, or implied license. Therefore, Plaintiff is entitled to summary judgment on Count I of the Complaint and the S&F Defendants' motion for summary judgment on this claim should be denied.

B. The S&F Defendants' First Counterclaim - Copyright Infringement Based on the Novel

Plaintiff seeks summary judgment on the S&F Defendants' First Counterclaim for copyright infringement based on the publication of the Novel in 1994. Plaintiff argues that if the court finds that Plaintiff owns the copyrights to the Screenplay, the S&F Defendants can not state a claim for copyright infringement. The S&F Defendants concede that if the court finds that Plaintiff is the owner of the Screenplay, then their claim for infringement fails, and that their counterclaim for infringement should be dismissed based on the statute of limitations and laches. However, they then argue that the court should still consider the counterclaim as a setoff against Plaintiff claims for interference.

The S&F Defendants First Counterclaim is premised on a finding that S&F is the owner of

copyrights in the Screenplay: "Defendants affirmatively allege that Kesey's novel infringed Defendant's copyright . . . ." (S&F Defs.' Answer ¶ 21.)  The determination that Kesey and Smith, and then Plaintiff, were the owners of all copyrights in the Screenplay negates this basic premise. Accordingly, the First Counterclaim is not supported by the record and does not stand as either a counterclaim or a setoff.  Plaintiff is entitled to summary judgment on the S&F Defendants' First Counterclaim for Copyright Infringement.

C.   The S&F Defendants' Second Counterclaim - Reliance on Work-For-Hire Representations

In their Second Counterclaim, the S&F Defendants assert a claim for the expenses they incurred in marketing the Screenplay based on "Kesey and Smith holding themselves out as work for hire employees of Defendants, failing to correct the statements of Defendants that this was a work for hire by Kesey and Smith that were made to third parties in Kesey's presence, and then upon not bringing this action with the proper statute of limitations. . . ." (S&F Defs.' Answer ¶ 22.) The court has already determined that Plaintiff filed this action in a timely manner.  The record is void of any evidence that Kesey and/or Smith represented to anyone that they were working as employees of S&F while writing the Screenplay.  Similarly, while Francis asserts that  Kesey failed to refute her claim that S&F owned the Screenplay made to third parties in Kesey's presence, there is no evidence that Francis specifically represented to third parties that Kesey and Smith were employees of S&F. Additionally, the court has limited the admission the purpose for which this evidence will be admitted.  Francis's statements are admitted only to prove that Francis did not ever hear Kesey refute claims made by Francis to third parties in Kesey's presence and which Kesey heard.  Even assuming Francis did represent to third parties that Kesey and Smith were employees of S&F while writing the

Screenplay, there is no evidence that Kesey was a party to the conversations in which the representations were made, that he actually heard the representations or that he did not deny the representations outside of Francis's presence.[16]

The record does not support the allegations of the S&F Defendants' Second Counterclaim. Accordingly, Plaintiff is entitled to summary judgment on this counterclaim as well.

## II. The S&F Defendants' Motion

A. Plaintiff's Count II - Intentional Interference with Prospective Business Advantage

In Count II of the Complaint, Plaintiff alleges that the S&F Defendants intentionally interfered with Plaintiff's attempts to market the Screenplay to motion picture studios, production companies, and other entertainment industry entities by falsely and wrongly claiming copyrights in the Screenplay. The S&F Defendants move to dismiss this claim based primarily on the assumption that the court will find that they are the owners of the Screenplay. In their motion, the S&F Defendants argue that "Counts 2 and 3 of the Complaint are wholly derivative of the copyright issue which is to say that if Defendants prevail, then there can be no action against the Defendants for doing anything because the state-law based claims in Count 2 and 3 are subject to pre-emption because they mirror what would otherwise be a copyright infringement claim." (S&F Defs.' Mot. for Summ. J. at 25.)(emphasis added). Similarly, in their reply brief, the S&F Defendants assert that:

> Plaintiff completely ignores that the liability portion of Counts 2 and 3 depend entirely on a finding that Plaintiff has the rights to the screenplay in Count 1 and if such is not the case, then the fact that different remedies may exist in Oregon law than in federal copyright law is of no legal impact for pre-emption purposes.
>
> It would be the oddest of results if this Court could somehow find that

---

[16]Plaintiff's arguments that this counterclaim should have been asserted against Kesey's estate need not be addressed as the counterclaim is not supported by the record.

Defendants had the rights to the screenplay in Count 1 but found that Plaintiff could go to trial on Counts 2 and 3. Such a finding on Cou[n]t 1 would collaterally estop Plaintiff from being able to prevail on Counts 2 and 3 as a matter of law.

(Defs.' Reply at 20.)

The S&F Defendants argument that Count II of the Complaint should be dismissed to the extent it relies on the S&F Defendants' ownership of the Screenplay is without merit in light of this courts finding that Plaintiff is the sole and exclusive owner of all rights in and to the Screenplay. However, because the S&F Defendants may attempt to raise a preemption argument in the future, the court will address that argument at this time even though it was not fully argued by the S&F Defendants in their motion and reply.

The Act grants the owner of a copyright the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare the derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, panotmimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrights work publicly; and

(6) in the case of sound recordings, to perform the copyrights work publicly by means of a digital audio transmission.

17 U.S.C. § 106 (2007). The Act, in § 301(a), broadly and explicitly preempts any overlapping state

law claims:

> On or after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a) (2007). However, the Act specifically acknowledges that it does not annul or limit "any rights or remedies under the common law or statutes of any State with respect to . . . activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106. . . ." 17 U.S.C. 301(b)(3) (2007).

Based on these statutory provisions, the Ninth Circuit has created a two-part test to determine when a state-law claim is preempted by the Act: (1) is the subject matter of the state law claim covered by the express provisions of the Act as set forth in §§ 102 and 103; and (2) are the rights asserted under state law equivalent the exclusive rights of copyright owners set forth in § 106? *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137-38 (9th Cir. 2006). To meet the second part of the test, the state law right asserted must be:

> equivalent to rights within the general scope of copyright as specified by section 106 of the Copyright Act. Section 106 provides a copyright owner with the exclusive rights of reproduction, preparation of derivative works, distribution, and display. To survive preemption, the state cause of action must protect rights which are qualitatively different from the copyright rights. The state claim must have an extra element which changes the nature of the action.

*Del Madera Properties v. Rhode and Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987) *overruled on other grounds, Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).

Plaintiff alleges that the S&F Defendants intentionally interfered with Plaintiff's prospective

business relationships by "falsely and wrongfully claiming rights in and to the copyright in the Screenplay, thus blocking the development, production or distribution of any motion picture based on the Screenplay pursuant to a license granted by Plaintiff." (Compl. ¶ 26.) The Screenplay, which is the subject matter of Plaintiff's state-law claim, is a literary work and is undeniably covered by the Act. 17 U.S.C. § 102(1) (2006). However, falsely or wrongfully claiming rights in copyrighted work is not a violation of § 106. While the claim requires a determination of who is the owner of the Screenplay, which is a question that must be resolved under the Act, the gravamen of the claim is that the S&F Defendants knowingly and intentionally interfered with Plaintiff's right to exploit the Screenplay by misrepresenting that it was the owner of the Screenplay. This is not related to, and does not fall within, the exclusive rights of reproduction, preparation of derivative works, distribution, and display granted by the Act.

To prevail on a claim for tortious interference with economic relations, a plaintiff must establish six elements: "(1) the existence of a professional or business relationship (which could include e.g., a contract or prospective economic advantage), (2) intentional interference with that expectation, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995). The tort "arises when a defendant induces a third party not to enter into or not to continue a business relationship with the plaintiff." *Dial Temporary Help Service Inc. v. Shrock*, 946 F. Supp. 847, 855 (D. Or. 1996). The interference must be wrongful "by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reasons of a statute or other regulation, or a recognized rule of common law, or perhaps an

established standard of a trade or profession." *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 209 (1978).

The claim of tortious interference includes the extra elements of an imminent or existing relationship which would financially benefit the copyright holder, interference with such rights by a third party, and the existence of improper means or purpose beyond the interference itself. These elements are not present in a claim for infringement under the Act, which requires a plaintiff to show only ownership and the improper use of the copyrighted material as defined under § 106. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636 (9th Cir. 2008)(quoting *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002)("In order to succeed in a copyright infringement claim, 'a plaintiff must show that he or she owns the copyright and that defendant copied protected elements of the work.'")). Accordingly, Plaintiff's claim for intentional interference with prospective business advantage is not preempted by the Act.

The S&F Defendants also move to dismiss Count I on the grounds that it is barred by the statute of limitations. The S&F Defendants argue that Oregon's two-year statute of limitations for tort claims found in OR. REV. STAT. 12.110 applied to Count II and limits Plaintiff from recovering damages for conduct occurring prior to March 2004. Plaintiff agrees that it is entitled to reach back only two years from the date the Complaint was filed on Count II. Accordingly, the S&F Defendants' motion for summary judgment on Count II should be granted to this limited extent.

B. Plaintiff's Count III - Negligent Interference with Prospective Business Advantage

Count III is identical to Count II except it is based on the S&F Defendants' negligent rather than intentional acts of interference. The S&F Defendants move for summary judgment on Count III, asserting the same arguments as on Count II and the additional argument that no such claim for

relief is recognized under Oregon law, but do so only in a one-sentence footnote with no citations to legal authority. Despite this cursory treatment, Oregon case law supports their additional argument.

The Oregon courts have refused to hold a third party liable for interference with another's prospective business advantage where the third parties actions were merely negligent, rather than intentional. *Mandal v. Hoffman Constr. Co.*, 270 Or. 248, 253 (1974)("We hold there is no such duty where the only negligence charged is the failure to perform a contract with a third party."); *Snow v. West*, 250 Or. 114, 118 (1968)(*citing Wampler v. Palmerton*, 250 Or. 65, 73 (1968)(To be actionable, the tort of interference with a contractual relation requires the interference to "be a knowing and not inadvertent or incidental invasion of plaintiff's contractual interest."). This is consistent with the Restatement (Second) of Torts § 766C (1979), which provides:

> One is not liable to another for pecuniary harm not deriving from physical harm to the other, if that harm results from the actor's negligently
>
> (a) causing a third person not to perform a contract with the other, or
>
> (b) interfering with the other's performance of his contract or making the performance more expensive or burdensome, or
>
> (c) interfering with the other's acquiring a contractual relation with a third person.

The Restatement has been cited by the Oregon courts on a number of occasions. *See, e.g., Lewis v. Oregon Beauty Supply Co.*, 302 Or. 616, 626 (1987); *Straube v. Larson*, 287 Or. 357, 361 (1979); *Top Service*, 283 Or. at 205-10. Also relevant to this issue is Oregon's economic loss doctrine, which provides that "a plaintiff seeking damages for purely economic losses in negligence can do so only on the basis of the breach of a duty other than the ordinary duty to exercise reasonable care

to avoid foreseeable harm." *Harris v. Suniga*, 209 Or. App. 410, 417 (2006).

The court agrees with the S&F Defendants that Oregon courts do not recognize a cause of action for negligent interference with prospective business advantage in this instance. The S&F Defendants are entitled to summary judgment on Count III of the Complaint.

### C. The Wilson Defendants' Cross Claims

The Wilson Defendants assert cross claims against the S&F Defendants for misrepresentation, intentional interference, and breach of contract. The S&F Defendants move for summary judgment on the misrepresentation and intentional interference claims relying on their previous arguments, including preemption, statute of limitations, laches, and estoppel. The Wilson Defendants have not filed a response to the summary judgment motion. For the reasons given above, the S&F Defendants' motion for summary judgment on the Wilson Defendants' intentional interference claim should be denied.

In their cross-claim for misrepresentation, the Wilson Defendants allege they "are entitled to a set off and/or a counterclaim and cross-claim for all monies they expended in the pursuit of marketing the screenplay since 1990 in reliance on Kesey, McMindes, Hagen and Sundown & Fletcher, Inc.'s granting rights, including option rights, to Defendants to market the screenplay and in reliance upon their assertions that they would provide clear title to the intellectual property." (Wilson Defs. First Am. Answer ¶ 23.) To support a claim for misrepresentation under Oregon law, a plaintiff must establish: 1) that defendant made a false representation of material fact; 2) with the knowledge or belief that it was false, or with an insufficient basis for asserting that it was true; 3) with the intent that plaintiff rely on it; 4) that plaintiff justifiably relied; and 5) that plaintiff suffered consequent damages. *In re Harris Pine Mills*, 44 F.3d 1431, 1438-39 (9th Cir. 1995)(citing *Riley*

*Hill Gen. Contractor v. Tandy Corp.*, 303 Or. 390, 405 (1987)). The requirement of a knowing, false representation distinguishes a misrepresentation claim from a claim brought for violation of the Act. Accordingly, the Wilson Defendants' claim for misrepresentation is distinct from, and not preempted by, the exclusive rights of copyright owners set forth in § 106 of the Act.

In Oregon, claims for misrepresentation are governed by the two-year statute of limitations found in OR. REV. STAT. 12.110(1), which provides:

> An action for . . . any injury to the person or rights of another, not arising on contract, . . . , shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit.

*Bodunov v. Kutsev*, 214 Or. App. 356, 359 (2007). A party "discovers" fraud or deceit when that party knew or should have known of the alleged fraud or deceit. *Mathies v. Hoeck*, 284 Or. 539, 542 (1978). In Oregon, this is a two-step analysis. Initially, the facts must establish that plaintiff had sufficient knowledge to "excite attention and put a party upon his guard or call for an inquiry." *Id.* at 543. If it appears that plaintiff had such knowledge, the court must then determine whether the facts establish that "a reasonably diligent inquire would disclose" the fraud. *Id.* This analysis is "normally a question for the jury except where only one conclusion can reasonably be drawn from the evidence." *Id.*

While the S&F Defendants have provided the court with evidence and supporting arguments addressing the issue of when Plaintiff, or its predecessors, became aware of S&F's claims of exclusive ownership in and to the Screenplay, S&F has presented no evidence or argument regarding when the Wilson Defendants knew or should have known that S&F's claims of ownership were sufficiently suspect to trigger either the statute of limitations or the laches period. It is possible that

such knowledge will not exist until after the issue of who owns all rights to the Screenplay is finally decided. Similarly, the S&F Defendants have failed to point to any conduct of the Wilson Defendants upon which the S&F Defendants reasonably relied in support of their estoppel argument. The arguments made with regard to Plaintiff, that Kesey affirmatively represented, or allowed the S&F Defendants and third parties to believe, that S&F owned rights to the Screenplay, are not applicable to the Wilson Defendants. In the absence of any evidence or arguments supporting these defenses, the S&F Defendants' motion for summary judgment on the Wilson Defendants' misrepresentation claim should be denied.

D.  Dismissal of Francis and Hagen in Individual Capacities

The S&F Defendants move to dismiss Francis and Hagen in their individual capacities arguing that S&F, as owner of the copyright to the Screenplay, is the only proper defendant. Plaintiff explains that it named Francis and Hagen as defendants based on the dissolution of S&F in 1991, OR. REV. STAT. 60.645, which allows an action to be brought against a dissolved corporation or the corporation's shareholders if the assets have been distributed, and the assumption that S&F's assets had been distributed to Francis and Hagen. Alternatively, Plaintiff argues that Francis and Hagen's counterclaim for copyright infringement is a judicial admission that they are asserting ownership to the Screenplay and thus justifies their inclusion individually as defendants.

The Oregon Secretary of State involuntarily dissolved S&F, for the second time, on July 13, 1991. (Aronoff Decl. Exh. Y.) Plaintiff assumes that the assets of the corporation were distributed to the individual defendants at that time. However, Francis represents that the assets of the corporation have not been distributed to herself or the other shareholders.

In Oregon, a corporation continues to exist after its dissolution, but only for the purpose of

winding up and liquidating its business and affairs. OR. REV. STAT. 60.637(1) (2007). The dissolution of a corporation does not automatically transfer title to the corporation's property. OR. REV. STAT. 60.637(2)(a) (2007). A claim against a dissolved corporation may be enforced either: "(1) against the dissolved corporation to the extent of its undistributed assets; or (2) if the assets have been distributed in liquidation, against the shareholder of the dissolved corporation. . . ." OR. REV. STAT. 60.645 (2007). The Ninth Circuit has recognized that "Oregon law on corporate dissolution does not include a provision making shareholders the successors of a dissolved corporation, or divesting the corporation of its assets or liabilities." *Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217, 1227 (9th Cir. 2004). It appears that the Screenplay was not distributed to Francis and Hagen as a result of the involuntary dissolution of S&F.

The fact that the Screenplay was not conveyed either automatically, impliedly or purposefully, to S&F's shareholders upon S&F's involuntary dissolution, does not mean that Francis and Hagen are not proper defendants in this action. To the contrary, the court finds that under Oregon law, Francis and Hagen are appropriate defendants because they knowingly acted on behalf of S&F after its dissolution.

It is clear that "the principle of de facto corporation no longer exists in Oregon." *Timberline Equip. Co., Inc., v. Davenport*, 267 Or. 64, 68 (1973). Oregon law maintains that all persons acting as a corporation, without the corporation being valid and registered, are liable for the debts and liabilities incurred or arising as a result thereof. *Id.* at 67-68. In *Mesaba Serv. and Supply Co. v. Martin*, 67 Or. App. 89, 91 n.1 (1984), the Oregon Court of Appeals recognized that the district court held the individual defendant liable for actions he took in the name of a corporation after the corporation was involuntarily dissolved, even though the individual was not aware the corporation

had been dissolved.  Both *Timberline* and *Mesaba* relied on OR. REV. STAT. 57.793,[17] the predecessor to OR. REV. STAT. 60.054, which states "All persons purporting to act as or on behalf of a corporation, knowing there was no incorporation, are jointly and severally liable for all liabilities created while so acting."  The only substantive change in the new statute is that it requires individuals acting in the name of the improperly incorporated or dissolved corporation have actual knowledge of the corporation status to be liable in place of the corporation.

Oregon's Secretary of State is authorized to involuntarily, or administratively, dissolve an Oregon corporation for failure to comply with statutory requirements after providing the corporation with written notice. OR. REV. STAT. 60.651 (2007).  The record reveals that the Secretary of State provided notice of his intent to dissolve S&F on May 29, 1991, and then dissolved S&F on July 13, 1991.  (Aronoff Decl. Exh. Y.)  Accordingly, if Francis and Hagen had notice that S&F was involuntarily dissolved in July 1991, they are individually liable for all liabilities created as a result of actions taken by them on behalf of S&F thereafter, such as liability resulting from the Second Deal Memo Option Agreement with the Associates, which they signed on behalf of S&F on August 12, 1992.  (Aronoff. Decl. Exh. X.)

The record establishes that S&F had been involuntarily dissolved in July 1988, and then reinstated in July 1990, just one year prior to the 1991 dissolution.  (Aronoff Decl. Exh Y.)  It can be reasonable inferred from this evidence that Francis and Hagen, as registered agent and president of the corporation, respectively, received notice of the Secretary of State's intent to dissolve S&F on both occasions, were familiar with the involuntary dissolution process, and had knowledge that

---

[17]OR. REV. STAT. 57.793 provided that "All persons who assume to act as a corporation without the authority of a certificate of incorporation issued by the Corporation Commissioner, shall be jointly and severally liable for all debts and liabilities incurred or arising as a result thereof."

in late 1992, they were signing the Deal Memo Option Agreement on behalf of a dissolved corporation. The S&F Defendants have presented no evidence to the contrary. Because Francis and Hagen continued to act on behalf of the corporation after dissolution, the court finds they are correctly included as individual defendants in this case. The question of whether Francis and Hagen admitted to owning the Screenplay by asserting a counterclaim for copyright infringement need not, and will not, be addressed.

## Conclusion

Plaintiff's motion (#66) for summary judgment should be GRANTED in its entirety. Plaintiff should be declared the sole owner of all rights in and to the Screenplay and any derivative works based on the Screenplay, and the S&F Defendants' Counterclaims should be dismissed. The S&F Defendants' motion (#62) should be GRANTED with regard to Count III of the Complaint and to the extent it limits Count II of the Complaint to conduct occurring two years before the Complaint was filed, and DENIED in all other respects. Additionally, Does 1-100 should be dismissed as defendants.

## Scheduling Order

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **August 31, 2009**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections are filed. When the response is due or filed, whichever date is earlier, the Findings

/ / / / /

/ / / / /

/ / / / /

and Recommendation will go under advisement.

DATED this 17th day of August, 2009.

JOHN V. ACOSTA
United States Magistrate Judge